IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

| | |
|---|---|
| **MARYLON BOYD, ET AL.,** | |
| Appellant/Plaintiff, | No. 07-16993 |
| **v.** | [Pro Bono] |
| **CITY AND COUNTY OF SAN FRANCISCO, ET AL.,** | |
| Appellee/Defendant, | |

United States District Court Northern District of California C04-5459

**APPELLANT'S OPENING BRIEF**

JAY B. SHAPIRO
State Bar No. 224100

FORMAN & ASSOCIATES
4340 Redwood Highway, Suite E352
San Rafael, CA 94903
Telephone: (415) 491-2310
Facsimile: (415) 491-2313

Attorneys for Appellant Marylon Boyd

# TABLE OF CONTENTS

JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ISSUES PRESENTED FOR REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF THE FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

SUMMARY OF THE ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    I      The District Court Abused Its Discretion by Denying Appellants'
          Motions to Exclude Evidence of Suicide-by-Cop. . . . . . . . . . . . . . 22
          A.    The Evidence Admitted Concerning Suicide-by-Cop Was
               Irrelevant to Officer Paine's Liability and Thus Inadmissible
               Under FRE 402. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
          B.    Dr. Keram's Suicide-by-Cop Testimony Was Inadmissible
               Under *Daubert*/FRE 702. . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
          C.    Defendants' Suicide-by-Cop Evidence Was Inadmissible Under
               FRE 403 Because the Risk of Unfair Prejudice, Confusion of
               the Issues and Misleading the Jury Substantially Outweighed
               Its Dubious Probative Value. . . . . . . . . . . . . . . . . . . . . . . . . 34
          D.    The Suicide-By-Cop Evidence Was Inadmissible Under FRE
               703 Because Its Dubious Probative Value Did Not
               Substantially Outweigh Its Prejudicial Effect. . . . . . . . . . . . 40
    The Suicide-by-Cop Evidence Was Inadmissible Under FRE 404. . . . . . . 41
    II     Most of the Contested Evidence Admitted as Relevant to Issues Other
          Than Suicide-By-Cop Should Have Been Excluded under Rules 402,
          403 or 404. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
          A.    Rap Music Lyrics and Newspaper Clipping. . . . . . . . . . . . . 42

i

B.   The May 2, 2004 Oakland Incident, Including Testimony from the Arresting Officers that Boyd Screamed at Them: "Kill me, Kill me, you filthy white racists". . . . . . . . . . . . . . . . . . . . . . . 45

C.   Drug Evidence and Testimony of Hogan and Williams About Boyd's Behavior Shortly Before His Death. . . . . . . . . . . . . . 47

III.   The District Court's Errors Were Not Harmless and Warrant a New Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

# <u>TABLE OF AUTHORITIES</u>

<u>FEDERAL CASES</u>

*Danjaq LLC v. Sony Corp.*,
263 F.3d 942 (9th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Elsayed Mukhtar v. Cal. State Univ., Hayward*,
299 F.3d 1053 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 51

*Graham v. Connor*,
490 U.S. 388 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 33

*McEuin v. Crown Equipment Corp.*,
328 F.3d 1028 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Palmquist v Selvik*,
111 F.3d 1332 (7th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Tennessee v. Garner*,
471 U.S. 1 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Turner v. Burlington N. Santa Fe R. Co.*,
338 F.3d 1058 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 41

*United States v. Alatorre*,
222 F.3d 1098 (9th Cir.2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Edwards*,
235 F.3d 1173 (9th Cir.2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Frederick*,
78 F.3d 1370 (9th Cir. 1996).......................................... 51

*United States v. Smith*,
230 F.3d 300 (7th Cir. 2000).......................................... 39

*United States v. Whitehead*,
532 F.3d 991 (9th Cir. 2008).......................................... 22

*United States v. Yazzie*,
59 F.3d 807 (9th Cir. 1995).......................................... 36, 45

*Wilson v. City of Chicago*,
6 F.3d 1233 (7th Cir. 1993).......................................... 37


FEDERAL STATUTES
28 U.S.C §1291..................................................... 1

28 U.S.C. §1331.................................................... 1

28 U.S.C. §1367.................................................... 1

42 U.S.C. §12101................................................... 1, 3

42 U.S.C. §1983.............................................. *passim*


FEDERAL RULES
Rule of Civil Procedure §42(b)...................................... 49, 50

Rule of Evidence 402........................................... *passim*

Rule of Evidence 403........................................... *passim*

Rule of Evidence 404........................................... *passim*

Rule of Evidence 702. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Rule of Evidence 703. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Rule of Evidence 802. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

## JURISDICTION

The district court had jurisdiction pursuant to 28 U.S.C. §§1331 & 1367 because Plaintiffs-Appellants brought claims under federal law (42 U.S.C. §1983 & 42 U.S.C. §12101) and brought claims under California law that form part of the same case or controversy. The jury returned a defense verdict upon which the court entered judgment on September 25, 2007. ER 3-5 & 1.

On October 24, 2007, Plaintiff-Appellant Marylon Boyd timely filed her Notice of Appeal under FRAP 4(a)(1)(A). ER 1. This Court has jurisdiction pursuant to 28 U.S.C §1291 because the appeal is from a final decision of the district court.

## ISSUES PRESENTED FOR REVIEW

[1] Whether the district court abused its discretion by allowing Defendants to present a defense based on a theory of suicide-by-cop and by admitting otherwise inadmissible evidence in support of that theory because such evidence was irrelevant, posed a near-certain risk of unfair prejudice and confusion of the issues that substantially outweighed its dubious probative value, and invited an improper character inference, and thus should have been excluded under Federal Rules of Evidence 402, 403, 404 and 703.

1

[2]     Whether the district court failed in its vital role as "gatekeeper" by

        permitting Dr. Emily Keram to testify as an expert on the so-called

        suicide-by-cop theory, when her expert report and the *Daubert*

        hearing made it apparent that her testimony was neither reliable nor

        relevant, and thus should have been excluded under Federal Rule of

        Evidence 702.

[3]     Whether the district court abused its discretion by admitting evidence

        deemed relevant to issues other than suicide-by-cop, including

        testimony about profane, violent and sexist rap music lyrics found in

        Cammerin Boyd's possession weeks before his death, which that the

        district court thought reflected Boyd's animosity and, thus, had some

        bearing on how Boyd may have acted when he was shot, because

        such evidence should have been excluded under Federal Rules of

        Evidence 402, 403, and 404.

[4]     Whether the district court's erroneous evidentiary rulings, taken

        together, were prejudicial and thus warrant reversal of the jury's

        verdict finding that Officer Paine did not use unreasonable force in

        fatally shooting Cammerin Boyd.

2

## STATEMENT OF THE CASE

The Court must consider whether the cumulative effect of the district court's erroneous evidentiary rulings, in particular, its admission of Dr. Emily Keram's expert testimony allowing Defendants to present a suicide-by-cop defense – *i.e.*, the theory that Boyd intentionally provoked the police into taking his life – and admitting otherwise inadmissible evidence in support of that theory, was prejudicial and thus warrants granting Appellants a new trial.

This lawsuit arises out of the death of Cammerin Boyd, who was shot and killed by Defendant-Appellee San Francisco Police Officer Timothy Paine on May 5, 2004. Plaintiffs-Appellants, the mother and daughters of Cammerin Boyd ("Boyd"), brought federal law claims under 42 U.S.C. §1983 against Officer Paine, other San Francisco police officers alleging excessive use of force, and against the City for inadequate supervision and unconstitutional polices and procedures, in violation of Boyd's Fourth and Fourteenth Amendment rights. Causes of action were also brought under the Americans with Disabilities Act (42 U.S.C. §12101) and under state law for wrongful death and negligence. ER 89.

Appellants moved to exclude numerous pieces of evidence that were highly prejudicial and of dubious probative value. Chief among these were evidence of suicide-by-cop and the testimony of Defendants' expert witness who would opine

3

that Boyd had engaged in such conduct.  The district court denied most of

Appellants' motions and deferred ruling on the ones whose relevance depended on

the admissibility of suicide-by-cop.  ER 10-11.  After holding a *Daubert* hearing,

the district court admitted Dr. Keram and all the evidence relevant to her

suicide-by-cop opinion.  ER 10-11.

Following a six week trial, the jury returned a unanimous defense verdict

after deliberating for three hours.  Judgment was entered on September 25, 2007;

Appellants filed their timely appeal on October 24, 2007.  ER 1.

Appellees' sought to introduce the testimony of someone who had never met

Boyd – Dr. Emily Keram, a psychiatrist claiming an expertise in the theory of

suicide-by-cop – who would opine that Boyd intentionally provoked his own

death.  Defendants argued that evidence of Boyd's intent to commit suicide-by-cop

was probative of his intention not to surrender on Larch Way, which in turn made

it more likely that Officer Paine's account of events was correct, which in turn

made his use of deadly force reasonable under the circumstances.

The district court recognized that Dr. Keram's testimony was the lynch pin

of Appellees' case, since the admission of her opinion would usher in a mountain

of irrelevant and prejudicial evidence that otherwise would have been excluded

from the jury's consideration (*e.g.*, Boyd's criminal history, and evidence of the

1993 high-speed car chase that resulted in a crash that cost him his lower legs). ER 593-606. Appellants vigorously opposed the admission of Dr. Keram's testimony, but the district court, following a *Daubert* hearing, admitted the testimony and with it the evidence that otherwise would have been excluded. The district court also admitted, again over Appellees' objections, evidence whose relevance was not tied solely to suicide by cop, including: evidence that Boyd was on drugs at the time he was shot; testimony about profane, sexist and violent rap lyrics found in Boyd's possession weeks before his death; and testimony that Boyd screamed "kill me, kill me, you filthy white racists" at the Oakland police officers who arrested him three days before his death. In effect, the district court permitted the trial to turn on the jury's views on Boyd's character, not whether the police acted reasonably in light of the conditions that actually presented to Office Paine on Larch Way.

At trial, the jury heard eyewitness and forensic testimony supporting each side's version of events. The introduction of evidence relevant to suicide-by-cop, however, cloaked in the aura of expertise, proved impossible to overcome. After six weeks of conflicting and often complicated testimony and evidence, the jury returned a unanimous defense verdict after a mere three hours of deliberation.

## STATEMENT OF THE FACTS

This case involves the shooting death of Cammerin Boyd ("Boyd").  Boyd, was a 29 year-old African-American male and a double amputee with prosthetic legs below the knees.  On May 5, 2004, San Francisco Police Officer Timothy Paine shot and killed Boyd following a vehicle pursuit through the Western Addition section of San Francisco.  The shooting occurred around 8:00 p.m. on Larch Way, a short street that is surrounded by homes on both sides of the street.  The shooting was witnessed by several Larch Way residents as well as at least six police officers who were present at the scene and had their guns drawn on Boyd.

The tragic chain of events began shortly before 8:00 p.m., when a San Francisco Police radio dispatch reported that a black male wearing a white do-rag and driving a black SUV had brandished a gun in an attempt to kidnap (Tatanika Hogan) in the Tenderloin area of the city and had just sped away.[1]  San Francisco Officer William Elieff saw a car and driver that matched the description and began pursuit.  Officer Elieff soon radioed that the driver of the SUV had fired several shots at him.  Officer Ellief's report was heard by, among others, Officers James O'Malley and Timothy Paine, who joined the pursuit after the SUV, followed by

_____

[1]  Months later, a second woman, Tiffany Williams, came forward alleging that a man matching the description of Boyd tried to kidnap her at gunpoint on the same day, near the same time and in the same neighborhood.

6

Officer Elieff and another police car, sped by as they were stopped at an intersection.

Boyd was pursued to Larch Way, a short residential street, where he slowed his vehicle to a crawl. Quickly, many police officers arrived on the scene and took positions near the SUV with their guns drawn. Officer O'Malley fired a shot at Boyd (still in the car), prompting additional fire from other officers who mistakenly assumed that the shots were coming from Boyd. When it became apparent that Boyd had not been disabled, the police began yelling that he get out of the car with his hands up. Boyd stuck both hands out of the open driver's side window, opened the door from the outside and stepped out with his hands up above his shoulders. Boyd did not have a gun in his hand or anywhere on his person.

What happened next is contested. At least five residents of Larch Way saw Boyd remove his shirt to show he was unarmed before putting his hands back up. The police ordered him to get down on the ground, but Boyd told the officers that he could not because of his prosthetic legs. Two eyewitnesses heard Boyd plead for his life, imploring the police not to shoot him. A few seconds later, with Boyd still surrendering, Officer Paine fatally shot him.

Officer Paine and the other officers remembered the events differently. According to Officer Paine, Boyd, after getting out of the car, refused to comply with the officers' orders to keep his hands up and get on the ground.  Instead, Boyd walked to the back of the car and then back to the open driver's door, where he sat on the floorboard.  Officer Paine saw Boyd, still seated, turn to put his hands in the car as if he were looking for something before turning back empty-handed.  Then Boyd again reached his hands towards the car's interior, appearing to put his hands under the front seat.  Paine believed that Boyd was groping for a weapon, and as Boyd began turning back, Officer Paine shot him; Boyd was empty-handed.  In a subsequent search of the car, the police found a gun in the pocket of the SUV's driver's-side door.

Boyd's mother and two daughters – Appellants in this appeal – filed a §1983 action alleging that Officer Paine used excessive force against Boyd in violation of his rights under the Fourth and Fourteenth Amendments.  (Appellants also brought a cause of action under the Americans with Disabilities Act, and state law claims for wrongful death, negligence.)  Because excessive force actions under 42 U.S.C. §1983 are analyzed under the objective reasonableness standard, *Graham v. Connor*, 490 U.S. 388 (1989), Officer Paine's liability turns on whether his use of deadly force was reasonable.  Pivotal to this determination was whether Boyd was

8

acting in such a way that a reasonable officer in Officer Paine's position would have used deadly force. Appellant's argued that Boyd was surrendering at the time he was shot; Paine argued that Boyd appeared to be reaching for a gun.

Both sides had eyewitnesses who would (and did) testify to their version of what happened on Larch Way, as well as forensic experts would provide evidence on the more esoteric scientific issues. The lynch pin of Defendant's case, however, was the theory that Boyd had engaged in "suicide-by-cop" - a course of intentional conduct designed to provoke a response of lethal force from law enforcement personnel. Defendants' theory of relevance was that evidence that Boyd had planned to provoke deadly force made it more likely he was not surrendering at the time he was shot, which made it more probable he was acting as Officer Paine observed, which, in turn, made the officer's use of deadly force reasonable. Defendants relied upon the testimony of psychiatrist Dr. Emily Keram who would provide an expert opinion that Boyd had engaged in suicide-by-cop.

Appellants filed motions in limine to preclude the Defendants from presenting any evidence on a suicide-by-cop theory, and to exclude the evidence of Dr. Keram. Appellants' motions challenged the admission of the following evidence:

9

- Boyd's alleged bad acts from May 5, 2004, none of which were known to Officer Paine or the other officers present when Boyd was killed. These acts comprised: the assault and attempted kidnapping of Tiffany Williams and Tatanika Boyd and the firing at police officers during the ensuing chase (hereinafter "Bad Acts");

- Boyd's prior criminal history and interactions with law enforcement, which included two felonies, several arrests, and a pending criminal charge for armed robbery, along with expert testimony about the prison sentence he likely would have faced had he survived (hereinafter "Prior Criminal History");

- the details of Boyd's May 2, 2004 arrest by the Oakland police for reckless driving (which Dr. Keram would describe as a "practice run" for his suicide-by-cop), including testimony from the arresting officers (hereinafter "Oakland Incident");

- statements Boyd allegedly made to the arresting officers at the Oakland Incident: "kill me, kill me, you filthy white racists" (hereinafter "Hearsay Statements");

- Boyd's high-speed chase with the California Highway Patrol in 1993 that resulted in the car crash that cost him his lower legs (hereinafter "1993 High Speed Chase");

- the testimony of Oakland Police Officer Michael Moody, who described the handwritten rap music lyrics he found in a car driven by Boyd several weeks before Boyd's death. The profane lyrics, scribbled on the back of a phone bill, described graphic violence against police and sexist and demeaning treatment of women. Officer Moody was permitted to testify to the lyrics' content and to "translate" them to the jury even though he never confiscated the lyrics and did not attempt to write them down from memory until two weeks later (hereinafter "Rap Lyrics");

10

- a toxicology report showing that Boyd had methamphetamine, MDA (a hallucinogen) and marijuana in his bloodstream at the time he was shot (hereinafter "Drug Evidence"); and

- that Boyd, and his mother (Appellant) on his behalf, had filed previous lawsuits against law enforcement agencies, including ones against the CHP (in 1993), Alameda County and the State for depriving Boyd of proper medical care during a previous confinement, and the Oakland Police Department regarding an alleged strip search of Boyd (hereinafter "Prior Lawsuits").

Defendants opposed these motions, as well as Appellants' motion to bifurcate the liability and damages portions of the trial.

The district court characterized Dr. Keram as the "lynch pin" to Defendants' case. ER 452. Without her testimony, much of the objectionable evidence would be excluded. "If the Defendant is allowed to argue a theory of suicide by cop, it just about brings in everything that they're trying to bring in this case, at least as a relevant matter." ER 443. The district court recognized the inflammatory nature of the evidence suicide-by-cop would usher in: "[B]ecause so much of what comes in is very, very – it would be highly prejudicial to let in so much of what [the defense] want to put in to support this [suicide-by-cop] defense." ER 452. The court denied most of Appellants' motions and deferred ruling on others pending a *Daubert* hearing to determine the admissibility of the suicide-by-cop theory. ER 10-11.

11

At that hearing, the district court decided to admit Dr. Keram's testimony under FRE 702 and, with it, the evidence subject to the remaining motions in Limine.  ER 265-425.  The court also denied Plaintiff's motion to bifurcate the liability and damages phases of the litigation.  ER 557-559.

**The District Court Trial**

During the six week jury trial, numerous residents of Larch Way testified about the events they witnessed leading up to and including Boyd's shooting.  Six of them testified that Boyd got out of the SUV with his hands up and took off his shirt to show he wasn't armed.  ER 142; ER 167-68; ER 172; ER 185-86; ER 203; ER 215-16.  The police ordered Boyd to get on the ground, but Michelle Cranshaw, Betrice Jackson, Mario Rogers and Otis Harris, testified that Boyd told the officers he couldn't; Jackson and Harris remember Boyd saying he had something wrong with his legs.  ER 184, 187; ER 206; ER 215; ER 237-240.  Rogers heard Boyd scream "don't kill me, don't kill me," "please don't hurt me, please don't kill me." ER 182, 216.  Fatima Wilson heard Boyd say: "I don't have a gun, please don't shoot me, I don't want to die.  ER 142.  Harris heard Boyd say: "You can't shoot me."  ER 221.  Cranshaw also heard Boyd say he did not have a gun.  ER 190, 196.  Rogers heard Boyd tell police, "I surrender;" Harris offered similar testimony.  ER 247-48.  Harris, Rogers and Jackson remembered that

12

Boyd's hands were around shoulder level or higher when Officer Paine shot him. ER 208, 219, 243. Cranshaw also thought Boyd was going to surrender because "it looked like he was trying to lower his self to get onto the ground." ER 194. Most of Appellants' witnesses testified to not seeing Boyd ever reach inside the car or underneath the driver's seat before Officer Paine shot him. ER 178, 193, 195, 220, 245

Officer Paine's testimony, echoed by other police officers at the scene of the shooting, painted a different picture. Paine had heard a radio dispatch around 8:00 p.m. in the early evening of May 5, 2008 that a black man wearing a white do-rag and driving a black Blazer had brandished a gun. The dispatch did not report, and Paine did not know, that the victim, Tatanika Hogan, had accused Boyd of trying to kidnap her. ER 255-57. Paine heard Officer Elieff's later dispatch about shots fired. ER 258. Paine had never heard of Boyd before May 5, 2008, so the dispatch information was all he knew of Boyd before he arrived at Larch Way. ER 255-259.

As Paine ran into position on Larch Way, he saw that Boyd was standing in the area of the open driver's side door, with his back to the driver's seat; he did not have a gun in his hands or on his person. ER 260-62. Paine testified that Boyd was not complying with his verbal commands, but did not remember whether

13

Boyd had his hands up to his shoulder or head level.  ER 249.  Paine also couldn't remember whether Boyd was wearing a shirt.  ER 253-254.  Paine saw Boyd leaning back, between a standing and seated position, against the open door.  ER 251-252.  Boyd then turned to his left with his right hand towards the front seat area of the car so that his back was partly towards Paine, but then quickly turned back; Paine could see he was empty-handed.  ER 263-64.  Then Boyd made the same turning motion, and as he began turning back to his right, he was shot three times by Officer Paine.

The jury heard from an array of witnesses.  The CHP officer involved in the 1993 High Speed Chase that culminated in the accident that cost Boyd his lower legs testified that Boyd was driving 140 miles per hour before the accident.

The jury also heard about from Oakland Police Officer Michael Moody, who testified about the Rap Lyrics found in Boyd's possession when Moody and his partner pulled him over on suspicion of his involvement in drug activity.  ER 144.  A search of the car uncovered the rap music lyrics written on the back of a phone bill in the car Boyd was driving.  ER 145-46.  According to Moody, Boyd admitted the lyrics were his.  ER 150.  Moody did not confiscate the items, and would have had no reason to know that they would be admitted later as evidence in a civil trial.  Only after two weeks did he write down the lyrics from memory.

14

ER 149-151. Nonetheless, the court permitted him to testify about the lyrics from memory and, based on the knowledge acquired from 20 years of listening to rap music, to translate them into "plain English" for the jury. ER 146. The jury heard the following lyrics attributed to Boyd, with translations provided by Moody (in brackets):

> Bitches are to be pimped in this world for money.
> ["Basically supports prostitution."]
>
> I'm a ball in this world, man; motherfuckers don't want to see me and don't want to feel me. ["I'm a player in this game, I'm a street hustler, whoever it may be. Maybe you're – you may be in some kind of illegal activity or you just may be some kind of vendor who's grinding on the street trying to make his way, washing cars or washing windows, or selling narcotics or selling illegal merchandise. Could be variety of things."]]
>
> Don't sweat these pigs when these motherfuckers trying to interrupt your flow. ["Don't mind the police when they interrupt trying to negate what you're trying to do, no matter what it may be."]
>
> And when these bitch ass pigs - 'meaning cops' - trying to fuck up your pimping, split the cop's wig and keep moving always.

ER 147-48. About the last lyric, Officer Moody explained that the understanding of "split the cop's wig" is "universal". [It] means to kill a cop." ER 148.

15

Anthony Brass, the defense's criminal sentencing expert, testified about Boyd's pending charges for armed robbery, which, Defendants argued, was probative of his motivation for committing suicide, that is, avoiding a long prison sentence. Notwithstanding that Boyd had not been convicted of the charges, Mr. Brass concluded that, based on his prior felony convictions, Boyd faced between 15 and 26 years in jail. ER 130. Mr. Brass also calculated the sentences Boyd could receive for the crimes he allegedly committed the day of his death – attempted kidnapping, assault with a firearm, and attempted murder of a police officer. ER 131-141. Although Boyd was never charged, tried or convicted and thus no one could know whether the prosecution would have been successful, Mr Brass concluded Boyd would have served the rest of his life in prison. ER 141.

Dr. Keram, Defendants' suicide-by-cop expert, testified late in the trial and her testimony provided a series of powerful moments for the defense. She addressed every piece of evidence that Appellants had sought to exclude and explained how each supported her opinion that Boyd had committed suicide by cop. For example, she told the jury that Boyd's use of a gun in the assault of Tiffany Williams and attempted kidnapping of Tatanika Hogan shortly before the Larch Way incident reflected his intent to grab the attention of the police and show he had a deadly weapon. ER 123-24. The 1993 CHP incident and Boyd's

16

subsequent arrests and convictions supposedly established Boyd's hatred of law enforcement; the Rap Lyrics reflected that animosity. ER 114-15. The Oakland Incident when Boyd was arrested after allegedly leading the Oakland PD on a high speed chase was not a distinct event but, in Dr. Keram's view, a "practice run" for the tragic events three days later. ER 116-120.

As for the eyewitness testimony that Boyd at times appeared to be surrendering, Dr. Keram found that such behavior was consistent with engaging in suicide-by-cop. In her opinion, surrendering did not undermine her theory, but was actually consistent with suicide-by-cop in several respects. First, she posited that Boyd may have felt ambivalent, as many people when contemplating suicide. Second, she speculated that the surrendering behavior may have been part of a cat-and-mouse to psychologically scar the police. And third, she suggested that Boyd may have wanted to demonstrate to potentially sympathetic witnesses that any shooting would be uncalled for.

Following a six week trial, the jury deliberated for around three hours before returning a defense verdict and finding that the police had not acted unreasonably in killing Boyd. ER 2-5.

## SUMMARY OF THE ARGUMENT

The Court must consider whether the district court committed reversible error by admitting all manner of evidence that the trial judge herself recognized was highly prejudicial. Central to this inquiry is the failure to exclude evidence of the suicide-by-cop theory and particular evidence admitted in support of that theory (collectively "suicide-by-cop evidence").

The suicide-by-cop evidence was inadmissible under Federal Rule of Evidence 402 because it was not probative of any material fact in this dispute. Under *Graham v Connor*, 490 U.S. 386 (1989). Appellants' claim of excessive force is analyzed under an objective reasonableness standard. The question is whether the officers' actions were "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. *Graham*, 490 US at 397. Any evidence that does not bear on the situation that confronted the officers in Larch Way on May 5, 2004, is irrelevant to the objective reasonableness of their use of force. None of the suicide-by-cop evidence – including Boyd's Criminal History, the 1993 Incident, aspects of the Oakland Incident, the Prior Lawsuits – was known to Officer Paine (or the other officers at the scene), so none could be relevant to assessing whether Officer Paine's use of deadly force was objectively reasonable. ER 255-59.

18

Even if one accepted the City's theory of relevance for suicide-by-cop, the evidence was inadmissible under Federal Rule of Evidence 403. As the district court recognized, the suicide-by-cop evidence was highly prejudicial, and the suicide-by-cop theory was questionable. ER 452-53, 474-77. Presenting that evidence to the jury portrayed Boyd as an inveterate, dangerous criminal who held no regard for the law or the safety of others. Moreover, expert testimony that Boyd would have spent the rest of his life in jail conveyed the idea that his life had little value. The objectionable evidence also created a great risk of confusing and misleading the jury by shifting its attention to whether Boyd was actually suicidal (a point Appellants challenged) and how that might have affected (or not) his behavior on May 5, 2004, rather than the proper inquiry into whether the evidence bore any relevance to the perceptions of the officer who shot him. It also invited the jury to find that Boyd was a person of suicidal character who acted in conformity therewith; use of the evidence for this purpose violated Federal Rule of Evidence 404.

The district court also erred by admitting the expert testimony of Dr. Emily Keram. Dr. Keram's expert report (ER 593-606) and her testimony at the *Daubert* hearing (ER 265-425) demonstrated that her opinion that Boyd had committed suicide-by-cop was both unreliable and irrelevant. To reach her conclusion, she

19

relied on so-called "risk factors" that purportedly identify persons who have provoked lethal force to kill themselves. The factors identified by Dr. Keram, which included possessing suicidal intent and a desire to be shot by the police, seemed reasonable on the surface, but they were deemed to be satisfied by such general behavior or circumstances that large swaths of the criminal population would be expected to commit suicide-by-cop. Dr. Keram's opinion was undermined further by her reliance on suspect circumstantial evidence and failure to adequately account for other evidence that undermined her conclusions.

The district court admitted some evidence that, in the judge's view, was relevant independent of Defendants' suicide-by-cop theory of the case. Most of this evidence, however, was inadmissible under Rules 402 and 403. For instance, the court deemed the Rap Lyrics as evidence that Boyd hated the police, which in the court's view "has some bearing on how [he] may have acted at the time of the event, perhaps acted more desperately or less logically as a result of that." ER 553. Apart from the dubious reliability value of inferring a person's sincere beliefs from the music lyrics he may write, the lyrics' profane, violent and sexist nature would have overwhelmed whatever scant probative value they brought to Boyd's behavior on Larch Way. Moreover, asserting that Boyd had animosity towards the police and that he therefore acted in accordance with that anger at the time he was

shot violated FRE 404. Similar problems attached to the district court's admission of evidence on the Oakland Incident, the drugs in Boyd's system and the time he was killed, and the testimony of the two women Boyd allegedly assaulted shortly before the car chase culminating on Larch Way.

Cumulatively, the district court's errors prejudiced Appellants and warrant a new trial. The district court and the parties recognized that a finding of liability would turn on a discrete factual question: what was Boyd doing at the time he was shot? Each side presented eyewitness testimony in support of its version of events; the case should have been decided based on the persuasiveness and credibility of these percipient witnesses, with the help of experts on blood work, bullet trajectory, and the like who relied on well-established and accepted principles of science. Instead, the district court admitted the testimony of Dr. Keram who spun out for the jury speculative theories based on questionable methodology and spilling over with evidence that was highly prejudiced to Boyd. Cloaked in the aura of authority, her opinion made the difference.

## STANDARD OF REVIEW

The Court reviews the district court's evidentiary rulings for abuse of discretion. *United States v. Edwards*, 235 F.3d 1173, 1178 (9th Cir. 2000); *United States v. Alatorre*, 222 F.3d 1098, 1100 (9th Cir.2000) (applied to decision to

21

admit expert testimony). So, too, the trial court's decision not to bifurcate. *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 961 (9th Cir. 2005). This court will find an abuse of discretion only if it has the "definite and firm conviction that the district court committed a clear error of judgment." *United States v. Whitehead*, 532 F.3d 991, 996 (9th Cir. 2008). To reverse on the basis of an evidentiary ruling, this Court must conclude both that the trial court's error was prejudicial – that it, more likely than not, tainted the verdict. *McEuin v. Crown Equipment Corp.*, 328 F.3d 1028, 1032 (9th Cir. 2003).

## ARGUMENT

**I    The District Court Abused Its Discretion by Denying Appellants' Motions to Exclude Evidence of Suicide-by-Cop**

### A.    The Evidence Admitted Concerning Suicide-by-Cop Was Irrelevant to Officer Paine's Liability and Thus Inadmissible Under FRE 402

Federal Rule of Evidence 402 prohibits the admission of irrelevant evidence. Because the Supreme Court's Fourth Amendment jurisprudence rendered the defendants' suicide-by-cop evidence irrelevant to any fact of consequence in Appellants' lawsuit, the district court's refusal to exclude that evidence was an abuse of discretion.

"Apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). "[Excessive force] claims are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Graham v Connor*, 490 U.S. 386, 388 (1989). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. The inquiry "is an objective one: the question is whether the officers' actions are "objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.*, at 397 (quotations omitted).

Over Appellants' objections, the district court permitted Defendants to introduce testimony on the theory of suicide-by-cop circumstantial evidence admitted in support of that theory (collectively "suicide-by-cop evidence") for its relevance to Officer Paine's liability, including: testimony from the CHP officer involved in the 1993 High Speed Chase; Boyd's Criminal History,[2] including the testimony of Defendants' criminal sentencing expert that Boyd, had he not been killed, would have spent the rest of his life in prison for the crimes he allegedly

---

[2] The court limited evidence on prior criminal history to the fact of commitment; defendants could not introduce evidence on the underlying charges. ER 502-504.

23

committed the day he was killed; the Oakland Incident, including the testimony of the arresting officers that Boyd screamed at them: "kill me, kill me, you filthy white racists;" the prior lawsuits filed by Boyd or his mother against law enforcement agencies.[3]

The district court should have excluded all of the suicide-by-cop evidence, which Dr. Keram relied upon in forming the opinion she explained to the jury. A common thread running through all of the disparate events, opinions and allegations admitted in support of Dr. Keram's suicide-by-cop theory is that not a single one was known by Officer Paine at the time he shot Boyd, and thus were incapable of informing Paine's decision to use deadly force. Officer Paine was free to describe to the jury what he knew and had observed of Boyd on May 5, 2004. But as applied in this case, suicide-by-cop was irrelevant to whether Officer Paine, based acted reasonably based on what he knew at the time he shot Boyd.

**B.     Dr. Keram's Suicide-by-Cop Testimony Was Inadmissible Under *Daubert*/FRE 702**

---

[3] ER 10-11(Order showing motion in limine [MIL] rulings); ER 6-18 (MIL #1: Bad Acts on May 5, 2004); ER 18-57 (MIL #2: Suicide-by-Cop); ER 57-81 (MIL #3: Prior Criminal History); ER 81-85 (MIL#4: Pending Criminal Case and Expert's Testimony re: sentencing); ER 85-118 (MIL #5: Oakland Incident); ER 118-123 (MIL #6: 1993 CHP Incident); ER 124-128 (MIL #7: Rap Music Lyrics); ER 128 (MIL #8: Drug Evidence); ER 129-132 (MIL #9: Prior Claims and Lawsuits); ER 134-138 (MIL #10: Hearsay Statements).

Even if Defendants' suicide-by-cop theory were otherwise relevant and admissible under Rule 402 of the Federal Rules of Evidence, Dr. Keram's testimony supporting her suicide-by-cop theory should have been excluded under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny.

Federal Rule of Evidence 702 "assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597. As gatekeeper, the judge must exclude all expert testimony unless "the reasoning or methodology underlying the testimony is scientifically valid and . . . properly can be applied to the facts in issue." *Id.* at 592-93. Ensuring that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field" is "vital to ensure accurate and unbiased decision-making by the trier of fact." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *Elsayed Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1063 (9th Cir. 2002).

Expert testimony reflecting "scientific knowledge," including psychiatry and psychology, must be grounded "in the methods and procedures of science" and cannot reply on "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. The non-exhaustive list of factors for determining whether expert

testimony is sufficiently reliable to be admitted into evidence includes:(1) the "key question" of whether the expert's findings can be (and have been) tested, (2) whether the expert's theory has been subjected to peer review and publication, (3) the known or potential error rate, and (4) whether the theory or technique is generally accepted in the relevant scientific community. *Id.* at 593-94.

The suicide-by-cop theory espoused by Dr. Keram fails to meet the scientific standards required for admissibility because its application cannot be tested, peer-reviewed for reliability, or analyzed to determine its rate of error. It is quite possible that some individuals decide to end their own lives by baiting the police into using lethal force. The theory defies any reliable method for identifying people who commit suicide-by-cop and their reasons for doing so because individuals who are suspected of seeking to commit suicide in this fashion generally are dead, and therefore cannot confirm or deny any hypothesis made about their intentions. As Dr. Keram conceded at the *Daubert* hearing, researchers have two avenues of investigation, each compromised in its own way. Researchers can review cold files involving police shootings to identify people who seem to have engaged in suicide-by-cop and then look for factors in their lives that would appear to predict a suicide-by-cop. ER 287-288, 292. Or, researchers might study/interview the few survivors of suicide-by-cop, or those

considering suicide in that way, to determine if any overarching truths can be extrapolated from these individuals' idiosyncratic feelings, beliefs and actions.  ER 278-280.

The indeterminacy the results from these approaches is evident in Dr. Keram's Expert Report and her testimony at the *Daubert* hearing.  ER 593-606; ER 265-425  Relying on unreliable correlation studies and her own discussions with suicidal individuals, and applying them to Boyd's life events, Dr. Keram opined that Boyd committed suicide-by-cop because he had or may have had certain "risk factors" that are commonly found among people who are believed to have committed suicide-by-cop.  ER 306-307; *see also* ER 599-604 (observing that Boyd's behavior "is consistent with" the conduct of other suicide-by-cop victims).  The four factors relied up on by Dr. Keram were: (1) having suicidal intent, (2) desiring to be shot by police, (3) having, or giving the appearance of having, a lethal weapon, and (4) intentionally escalating encounters with the police.  ER 24, 30.

Dr. Keram testified that "the first question that anybody worth their salt who is referred this type of case for analysis looks at is, was this person suicidal?  And if they're not, then it's not going to be a suicide by cop."  ER 304; 357-58.  But her discussion of what passes for evidence of suicidal intent illustrates the lack of

scientific rigor in her approach. After combing through Boyd's entire life history, Defendants uncovered no evidence of prior suicide attempts or any suggestion that Boyd was diagnosed to be suicidal or depressed. Unfazed, Dr. Keram found "sufficient" circumstantial indicia of Boyd's suicidal intent from a variety of unexpected sources. For example, Boyd had recently passed what Dr. Keram termed "a very significant anniversary" – the end of April, 2004 marked the 11th year since the car accident that cost Boyd his lower legs; in Dr. Keram's view, the reminder of this tragic event would have created feelings of loss and regret that made him a suicide risk. ER 307.

Other indicators of Boyd's suicidal desire included: the considerable prison sentence that may have loomed over Boyd at the time he was killed; the brazenly illegal behavior on May 5, 2004 that was certain to bring him to the police's attention; firing at the police during the ensuing pursuit; Boyd's sporadic compliance with police commands on Larch Way to get down on the ground; Boyd's alleged statement to Oakland and San Francisco police that they could just shoot him; and Boyd's reaching twice into the front seat area of his SUV to elicit the fatal shots from Officer Paine. ER 296-97; 603.[4]

_____

[4] To her credit, Dr. Keram recognized the inherent unreliability of such statements (assuming they were ever made), as they may have been said sarcastically or to challenge the police, rather than as a sincere expression of

28

The district court did not require Dr. Keram to grapple with three apparent problems. First, the so-called risk factors are so general that they fail to distinguish Boyd from the legions of people in the general population who engage in criminal activity but do not commit suicide-by-cop. Plenty of criminals facing long prison sentences, resort to desperate measures to resist arrest, continue to commit risky crimes, and experience anniversaries of unpleasant times in their life, but it is hard to imagine that a significant number of these persons is committing suicide-by-cop.

Second, as applied by Dr. Keram, it appears that nearly any undesirable life situation or self-destructive behavior could be conceived as an indicator of suicidal intent.

Third, and perhaps most important, Dr. Keram did not offer, and the district court did not insist upon, a reasoned explanation of how she accounted for the evidence manifestly contrary to her conclusions.[5] For example, Dr. Keram relies on the aforementioned "just shoot me" statement as evidence of Boyd's desire to be killed by the police. Perhaps such words were uttered and uttered in earnest.

---

suicidal intent. ER 358.

[5] The district court broached the issue with Dr. Keram but did not press her to reconcile the contrary evidence. ER 353-361.

29

What then should one make of the other eyewitnesses to the Larch Way incident who heard Boyd beg the police not to shoot him?[6] ER 142; ER 216. Or the testimony from two people who knew Boyd well – his father and the mother of his daughter – that his mood was uplifting, not depressed, in the weeks before his death. ER 111; ER 112-113. Dr. Keram failed to either account for that contrary evidence in her theory or admit that she could not, as she would have if she had adopted a scientifically valid approach rather than cherry-picking the evidence that supported her theory.

Dr. Keram also assumed as true the testimony of eyewitnesses who remember Boyd sitting down on the floorboard of his car and then reaching twice into the car in defiance of the officers' orders. ER 296, 371-72. (Conveniently, Dr. Keram then relied on this "evidence" as a sign of Boyd's suicidal desire. ER 296-97.) Just as easily, however, she could have relied upon contradictory accounts from many of Appellants' witnesses saw who thought Boyd appeared to be surrendering. ER 247-48. In doing so, she substituted her judgment for the jury's. And in any case, Boyd's failure to comply with the instructions shouted at him from the other side of multiple firearms is much more easily explained by

_____

[6] Dr. Keram's Expert Report lists the deposition testimony of these (and other) eyewitnesses among the materials considered by her in rendering her report. ER 596.

confusion, impaired judgment due to the stress of arrest or drug use, difficulty moving due his prosthetic legs, or numerous other factors rather than suicidal intent. ER 358-59.

When not ignoring seemingly reliable evidence contrary to her analysis, Dr. was content to severely discount it or recast it in an unlikely way so that it actually supported her view. This was particular so with respect to evidence (or lack of it) that undermined her claim that Boyd was suicidal: e.g., the absence of a suicide note or history of any suicidal ideation, Boyd's pleas to the police that they not shoot him, his attempts to demonstrate he was unarmed, putting his hands in the air for much of the encounter with the police. Dr. Keram noted that it was well-documented in her field that many persons engaging suicide demonstrated ambivalence, even attempts at surrender, during the process. Perversely, Dr. Keram transformed any evidence of an attempt to surrender from evidence contradicting an intent to suicide-by-cop into evidence supporting her theory that Boyd wanted to be killed by the police. ER 326-28. Thus, the fact that eyewitness testimony described Boyd as pleading for his life was of no moment to her opinion about Boyd's intentions on Larch Way. Moreover, Keram suggested that a suicide's expression of ambivalence might be a feint, a ploy to keep the police off-balance and increase the psychological discomfort of the situation. ER 330.

31

Unfortunately for Appellants, the only person who could testify as to the accuracy of Dr. Keram's speculation cannot do so, and did not think to do so while alive. Not surprisingly, nothing in Boyd's background or in the court record supported any of these theories.

Finally, Dr. Keram's conclusions often constituted speculative inferences from mostly generic facts. She reasoned that Boyd *might* have been suicidal because he might have faced a long prison sentence *if* convicted of a pending robbery charge, but that "factor" was purely speculative and failed to differentiate Boyd from many others awaiting trial on felony charges. ER 307. Dr. Keram also noted that Boyd *might* have felt animosity towards the police due to the 1993 accident in which he lost his legs and *might* have been feeling that loss more acutely because he had recently passed the 11 year anniversary of that encounter, but, again, there was no evidence to support her speculation. ER 307. Dr. Keram surmised that Boyd's prior incident with law enforcement in Oakland "may" have been "practicing" for his "suicide" in San Francisco, but again that was pure conjecture. ER 117. Even if Boyd had been practicing, it is hardly clear this would be indicative of suicide-by-cop since by Dr. Keram's own admission, only "some precipitators of SBC 'practice' for the event." ER 600. Dr. Keram's speculation about Boyd's state of mind fails *Daubert's* "key question" of whether

her theory can, and has been, tested. Even assuming that the evidence on which she relied was uncontested, had it been part of a scientific study prior to May 5, 2004, it would not have predicted future suicidal behavior. *Daubert* at 593 It is only when one looks in hindsight that unfortunate events taken on a sinister air; correlation, however, is not causation.

In sum, there is no reliable evidence that Boyd wanted to commit suicide, much less suicide-by-cop. Dr. Keram's hypothesis that Boyd wanted to be shot rests on nothing more than post-hoc rationalizations based on correlations among generic circumstances and behaviors. At bottom, Dr. Keram effectively asked the Court take her word for it even though Boyd did not appear suicidal to the court. ER 294, 304. And the court did, and in doing so abdicated its vital gatekeeping role. *See* Fed. R. Evid. 702 advisory committee's note (2000 amends.) ("The court's gatekeeping function requires more than simply 'taking the expert's word for it.'"). Because Dr. Keram's testimony was unreliable and irrelevant, the Court erred by admitting her testimony. *Kumho Tire*, 526 U.S. at 147-151; *Daubert*, 509 U.S. at 590.[7]

---

[7] Even if Dr. Keram's testimony was properly admitted, the admission of much of the evidence she relief upon in forming her opinion violated Federal Rule of Evidence 703. *See* §I–D, *infra*.

**C.** **Defendants' Suicide-by-Cop Evidence Was Inadmissible Under FRE 403 Because the Risk of Unfair Prejudice, Confusion of the Issues and Misleading the Jury Substantially Outweighed Its Dubious Probative Value**

Early on in the motion in limine hearing, the district court acknowledged the

potentially devastating impact of the evidence contested under suicide-by-cop:

> If you don't have this witness [Dr. Keram], you're
> probably not going to be able to present this defense,
> because after that it just becomes a hypothesis, basically,
> on the part of the defendant, so – and because so much of
> what comes in is very, very – it would be highly
> prejudicial to let in much of what you want to put in to
> support this defense.

ER 452. The district court ultimately allowed the Defendants to introduce the

suicide-by-copy evidence, including the suicide-by-cop theory and qualified Dr.

Keram as an expert and admitted her testimony applying her theory to Boyd's case.

The suicide-by-cop evidence should have been excluded, for its slight probative

value as to liability was substantially outweighed by the danger – indeed, great

likelihood – of unfair prejudice, confusion of the issues and misleading the jury.

Accordingly, Federal Rule of Evidence 403 compelled its exclusion.[8]

---

[8] "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. §403.

34

It is difficult to overstate the prejudicial nature of the evidence admitted by the district court. The theory itself presented great risk of prejudice because suicide carries with it a significant stigma, and suggested that Boyd desired to kill himself by provoking gunfire from police would brand him as a very disturbed, possibly repellant person. The evidence admitted in support of the theory was no less damaging. The jury heard testimony from the highway patrolman who recounted his involvement in the 1993 Incident, and from multiple witnesses about Boyd's Criminal History, including the pending charge for armed robbery. The portrait that emerged was of an inveterate, dangerous criminal who held no regard for the law or the safety of others. Testimony from multiple Oakland police officers that Boyd led them on a high speed chase three days before his death and then, when arrested, repeatedly shouted "kill me" fostered the same idea fostered the same idea while simultaneously creating the sense that he was mentally disturbed.

Other evidence, while perhaps packing a less visceral punch, was still prejudicial. Anthony Brass's expert opinion that Boyd likely would have spent the rest of his life behind bars had he survived the events of May 5, 2004, created a sense that Boyd's life had little value and, perhaps, that his death was no great loss to anyone. Evidence of the past lawsuits filed by Boyd or on his behalf by his

35

mother (Appellant) against law enforcement entities likely suggested to the jury that Boyd and his mother had an axe to grind with law enforcement and that the present lawsuit was just one in a long line that Appellant would bring at the drop of a hat.

This evidence was not merely prejudicial, but unfairly so. The contested evidence so impugned and devalued Boyd's character that the jurors might well have rendered a verdict for Defendants not because they believed Officer Paine's version of events but because they thought that on May 5, 2004 Boyd was acting like the convicted felon he was or was acting in accordance with his suicidal character (both impermissible propensity inferences under FRE 404[9]), and thus deserved whatever came his way. *See United States v. Yazzie*, 59 F.3d 807, 811 (9th Cir. 1995) ("Evidence is unfairly prejudicial if it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the [party] wholly apart from its judgment as to" the merits of the case.).

Federal Rule of Evidence 403's risk factors – confusion of the issues and misleading the jury – also were implicated by the suicide-by-cop evidence. The introduction of suicide by cop affected a paradigm shift in the nature of the case.

---

[9] "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Fed. R. Evid. 404(b).

36

With suicide-by-cop as the central issue in the case, the jury likely found itself wondering why Boyd seemed to have a predilection for engaging the police in dangerous car chases, or whether he actually was suicidal when there was no objective, direct evidence of it. Thus, what should have been a trial focusing on whether Boyd was trying to surrender or was making surreptitious movements toward the front seat of his car at the time he was shot, became a trial about the unflattering and tragic aspects of the last 11 years of Cameron Boyd's life rather than evaluation the actions of two men in a frightening situation, it became a trial on the value of Boyd to the jury. *See Wilson v. City of Chicago*, 6 F.3d 1233, 1236 (7th Cir. 1993) ("A mass of inflammatory evidence having little or no relevance to the issues in *this* trial . . . was admitted, and the defendants' counsel was permitted to harp on it to the jury and thus turn the trial of the defendants into a trial of the plaintiff.").

Federal Rule of Evidence 403 requires exclusion only if the dangers of unfair prejudice or confusion substantially outweighs its probative value. That standard is easily met here. None of the suicide-by-cop evidence is directly probative of the factual issue crucial to deciding liability under §1983: – what were the facts and circumstances confronting Officer Paine when he fatally shot Boyd on Larch Way? The evidence was relevant only to the extent it made the

suicide-by-cop theory a stronger explanation for what Boyd's intentions might have been. Even if one accepts that suicide-by-cop provided the proper lens for viewing Boyd's behavior on Larch Way, the theory hardly suggests that Boyd acted as Officer Paine claims – reaching into the front seat – when Paine shot him. *At most*, suicide-by-cop suggests that Boyd did not intend to surrender. That, however is weakly probative of Defendants' argument that he was acting in a way that would have provoked deadly force from a reasonable police officer. The risk of unfair prejudice and confusion generated by the suicide-by-cop evidence far outweighed its attenuated and dubious relevance to the question of liability.

The district court should have embraced the Seventh Circuit's reasoning in *Palmquist v Selvik*, 111 F.3d 1332 (7th Cir. 1993). In *Palmquist*, the defendants in a §1983 action unsuccessfully sought to introduce the testimony of the victim's friends and neighbors that he had intended to provoke the police into killing him, as well as evidence of his arrest for driving under the influence and marijuana possession earlier in the day and intoxication at the time of his death. *Id*. at 1339. Defendants argued that *Palmquist's* intention to commit suicide was relevant to showing that he, not Sgt. Selvik, was the cause of his death. The magistrate excluded the evidence and "limited the defense's evidence to the officers' personal

knowledge – their experiences and observations – during the morning in question." *Id.* at 1339.

The Seventh Circuit affirmed, holding that "evidence outside the time frame of the shooting is irrelevant and prejudicial." *Id.* Under *Graham's* objective reasonableness standard, the defendant officer's "liability [must] be determined exclusively upon an examination and weighting of the information [the officer] possessed immediately prior to and at the very moment he fired the fatal shot." *Id.* at 1340 (citations and quotations omitted). To hold otherwise, "would have shifted the jury's attention from Palmquist's behavior at the scene, which is material in judging the objective reasonableness of Sergeant Selvik's use of force, to information not possessed by Selvik, such as Palmquist's mental state and his physical behavior before the encounter." *Id.; see also United States v. Smith*, 230 F.3d 300, 309 (7th Cir. 2000) ("[S]pecific acts of conduct of the victim, if unknown to the individual claiming self-defense, are necessarily circumstantial in nature. It is only when the specific instances of conduct are known to the one claiming self-defense, and thus could have factored into the decision-making process that resulted in the act, that such instances should be admissible as essential elements of the claim.")

In short, the danger of confusion of the issues and misleading the jury was immense. It would have taken a jury full of Henry Fondas to see beyond the inflammatory nature of such evidence and focus on the evidence properly before it. Had the district court applied *Palmquist's* reasoning to this case, it would have diverted these landmines from the jury and allowed the fact-finders to focus on what mattered – the reasonableness of Paine's use of force based on what he knew on Larch Way – rather than prejudicial and confusing evidence weakly probative of Boyd's behavior just before he was shot.

**D. The Suicide-By-Cop Evidence Was Inadmissible Under FRE 703 Because Its Dubious Probative Value Did Not Substantially Outweigh Its Prejudicial Effect**

The arguments for excluding such evidence under Federal Rule of Evidence 703 are even more compelling than those for exclusion under Rule 403. Rule 703 provides that inadmissible information relied upon by an expert in forming her opinion is not rendered admissible simply because the opinion is admitted. *See* Fed. R. Evid. 703 & Adv. Comm. Notes (2000 Amendment). Rule 703 requires the trial judge to make two determinations: (1) are the facts relied upon by the expert of a type reasonably relied upon by others in the field?; and (2) does the probative value of the underlying evidence substantially outweigh its prejudicial effect? *Turner v. Burlington N. Santa Fe R. Co.*, 338 F.3d 1058, 1061-62 (9th Cir.

2003). The rule creates a presumption against disclosure to the jury of otherwise inadmissible evidence. *Id.* at 1062.

At the motion in limine hearing, the district court determined that the suicide-by-cop evidence was inadmissible for liability purposes in the absence of Dr. Keram's testimony. *See, e.g.*, ER 494-503 (pending criminal charges), (criminal history excluded on liability if not for suicide-by-cop); 543-44 (1993 incident); ER 556-557 (prior lawsuits). In other words, the evidence on which Dr. Keram relied was "otherwise inadmissible" under FRE 703.[10] Given the evidence's significant risk of unfair prejudicial value and questionable probative value, FRE 703 precluded the disclosure of that evidence. ER 180-81, 452-53.

**The Suicide-by-Cop Evidence Was Inadmissible Under FRE 404**

The suicide-by-cop evidence also ran afoul of Federal Rule of Evidence 404. The evidence was admitted because it supposedly demonstrated that Boyd's suicidal disposition which, Defendants argued, made it more likely that he acted in a suicidal fashion (*e.g.*, refusing to comply with the officers' orders) just before Officer Paine shot him. This evidence invited – indeed, for the evidence to be

_____

[10] As discussed later, some of the evidence relied upon by Dr. Keram for her suicide-by-cop opinion had independent relevance to damages, but that evidence should have been admitted (if at all) in the damages portion of a bifurcated trial.

41

relevant, required – the jury to conclude that because, according to the expert witness, Boyd was suicidal before the shooting he acted suicidal when he was shot. The Federal Rules of Evidence precludes admission of evidence for this purpose. *See* Fed. R. Evid. 404(b) (evidence is admissible "for the purpose of proving action in conformity therewith on a particular occasions."). And even if, as Defendants argued below, the evidence were properly construed as showing intent or motive, the risk that the jury would nonetheless make an impermissible character inference, coupled with the dubious probative value of the evidence, compelled its exclusion under FRE 403.

**II    Most of the Contested Evidence Admitted as Relevant to Issues Other Than Suicide-By-Cop Should Have Been Excluded under Rules 402, 403 or 404**

Although some of Defendants' objectionable evidence was deemed relevant to issues other than suicide-by-cop, much of it should have been excluded under Federal Rules of Evidence 402, 403 and 404.

**A.    Rap Music Lyrics and Newspaper Clipping**

Officer Moody testified from memory about the newspaper clipping and rap lyrics he found in Boyd's car several weeks before the shooting on Larch Way. ER 143-166. Appellants had objected to this evidence on relevancy grounds

42

(among others), but the district court explained why the lyrics were relevant regardless of suicide-by-cop:

> I think it's relevant. Certainly it's one of the factors, the hates police factor, that goes to suicide by cop, *and even with it* [suicide-by-cop] *out*, when somebody gets into an encounter with the police and has a general animosity to the point they're pleased that police have been killed and are advocating such, even if it's only in the course of musicality, such as it is, then it seems to me that has some bearing on how they may have acted at the time of the event, perhaps acted more desperately or less logically as a result of that.

ER 553 (emphasis added).

The district court's reasoning is problematic in several respects. As an initial matter, inferring a person's general state of mind (as opposed to a momentary snapshot during the artistic process) seems like a dubious exercise, and one more suited to a villain in an Orwell novel. Moreover, under *Graham v. Connor, supra*, whether Officer Paine's acted reasonably depends on the facts and circumstances known to him at the time. The fact, if it is a fact, that Boyd harbored general animosity towards police was not known to Paine and thus had no relevance to determining liability under 42 U.S.C. §1983. Also, even if Boyd had a general animosity towards police, that animosity is not probative of his having acted in any particular manner when standing across from Officer Paine on

43

Larch Way, much less a desire to die; surely, there is little reason to believe that Boyd's supposed anger made it more likely that he was reaching into the car rather than attempting to surrender when he was shot. The lyrics should have been excluded under Federal Rule of Evidence 402.

Federal Rule 403 also precluded the admission of the lyrics. To recite any of the rap lyrics is to demonstrate their offensiveness. Their profane, violent and sexist messages easily could have inflamed the jury, thereby inviting a verdict that would punish Boyd for his vulgarity rather than his behavior on Larch Way. Adding to the risk of unfair prejudice was the court's evident willingness to have Moody recite lyrics that had nothing to do with police officers. ER 147:4-19. It is hard to imagine how lyrics about "pimping bitches" were probative of Boyd's animosity towards police, and harder still to figure how the lyrics bore on how he might have acted on Larch Way. Finally, one cannot ignore that the district court allowed Officer Moody to testify about the lyrics from memory; he never confiscated them from Boyd and then waited more than two weeks before writing down what he remembered. The obvious questions about the reliability of Moody's recollection required the court to discount the already questionable probative value of the lyrics. Under these circumstances, the risk of unfair

prejudice from the lyrics dwarfed their relevance; FRE 403 compelled their

exclusion from trial.  *Yazzie*, 59 F.3d at 811.

Finally, as conceived by the district court, the lyrics were relevant to show

an aspect of Boyd's character – hatred of police – as the basis for inferring that he

acted accordingly during his confrontation with police on Larch Way.  The Federal

Rules of Evidence prohibit the introduction of evidence for this purpose.  *See* Fed.

R. Evid. 404; (evidence of other acts inadmissible to prove action in conformity);

*see also id.* 405(a) (requiring proof of character evidence by reputation testimony).

**B.    The May 2, 2004 Oakland Incident, Including Testimony from the Arresting Officers that Boyd Screamed at Them: "Kill me, Kill me, you filthy white racists"**

On May 2, 2004, Boyd allegedly engaged Oakland police in a high-speed

chase, after which Boyd complied with the officers' orders to get out of his car and

onto the ground, where the police handcuffed and arrested him.[11]  The district

court determined that the Incident was relevant to show that Boyd acted bizarrely

at the time of his death because he acted bizarrely three days earlier in Oakland.

ER 531-32.  The court also judge that Boyd's alleged statements to the arresting

officers – "kill me, kill me, you filthy white racists" – was not hearsay and was

_____

[11]  The admission of Dr. Keram's testimony ensured that evidence of the
Oakland Incident would be admitted incident to the suicide-by-cop theory as
relevant to Defendants' liability.  ER 511.

45

probative of Boyd's anger, which the court deemed "relevant to a certain extent as to what happened on the day in question."  ER 560.

Admitting testimony about Boyd's alleged bizarre and illogical behavior with police on May 2, 2004 to show he acted that way three days later runs afoul of FRE 404's proscription against admitting evidence of a person's character (here, anger) to demonstrate action in conformity at a later date.  That aside, however, even if Boyd's supposed illogical behavior were relevant to show similar behavior later that week, the unfair prejudice created by the evidence – portraying as an unstable criminal – would substantially outweigh the meager probative value of the evidence.

As for Boyd's alleged "kill me, kill me, you filthy white racists" statements, the court did not explain how his angry state of mind towards police (assuming the statements reflected that) had any tendency to make a material fact concerning liability more probable.  It is reasonable to infer, however, that the court relied on the same reasoning it had applied to the Rap Lyrics evidence.  The same reasons that justify excluding the lyrics apply to the "kill me" statements.  Thus, Boyd's alleged statements, assuming it was made at all, were inadmissible under Federal Rules of Evidence 402, 403 and 404.

In any case, the district court's hearsay analysis was incorrect. The court reasoned: "[I]t's not hearsay, it's not a declarative statement, couldn't possible be offered for the truth of the fact, because there is no fact in it." ER 559. The court overlooked that the statement was offered for the truth of the implied assertion "I want you to kill me" (evidence of Boyd's supposed suicidal intent) and was therefore inadmissible. *See* Fed. R. Evid. 802.

### C. Drug Evidence and Testimony of Hogan and Williams About Boyd's Behavior Shortly Before His Death

Over Appellants' objections, the district court admitted testimony about a toxicology report showing that Boyd had drugs in his system at the time he was killed. ER 553. The court also agreed to allow testimony from the two women, Tatanika Hogan and Tiffany Williams, who Boyd allegedly attacked shortly before leading the police on a chase that ended at Larch Way. The court reasoned that both were admissible independent of suicide-by-cop because the report and the testimony would show he was in an altered state which was, in the court's view, relevant to how he was acting on Larch Way. ER 432-443, 553.

If this evidence of Boyd's alleged erratic behavior shortly before his death was relevant to the question of liability, that relevance was slight. The crux of the case was whether Boyd's behavior on Larch Way was such that a reasonable

officer seeing that conduct would have been justified in using deadly force. That Boyd might have been acting erratically, however, does offers little reason to believe he appeared to act in so threatening or dangerous a manner that Officer Paine was justified in killing him. The slight probative value of the drug evidence and testimony from Hogan and Williams was far outweighed by the risk of substantial unfair prejudice. As with the suicide-by-cop evidence, the evidence was inadmissible under Federal Rule of Evidence 402.

Even if the evidence of drug use and attacks were relevant, however, that relevance was far outweighed by the risk of substantial unfair prejudice. As with the suicide-by-cop evidence, the evidence of drug use and, in particular the assault and attempted kidnapping of Hogan and Williams painted him as a desperate criminal for whose death the police should not be held liable. Moreover, evidence of Boyd's alleged attacks on two women invited the jury to punish him for that heinous conduct rather than considering whether his later behavior on Larch Way excused Officer Paine's use of deadly force against him. Federal Rule of Evidence 403 required the exclusion of that evidence.[12]

_____

[12] On appeal, Appellants do not challenge the district court conclusion that some evidence – namely, the aspects of Boyd's criminal history relevant to the prison sentence he would have received had he survived – was relevant to their damages claim. ER 485-496. (Appellants would have opposed introducing details of his previous crimes, pending charge for armed robbery and the alleged crimes

48

### III.   The District Court's Errors Were Not Harmless and Warrant a New Trial

The district court's error in admitting Dr. Keram's testimony was not harmless and the jury's verdict in this case must be overturned.  *Elsayed Mukhtar*, 299 F.3d at 1063-64.

The critical issue in this case was a factual one: what was Boyd doing at the time Officer Paine shot him?  The percipient witnesses were divided on this factual question: the police officers at the scene testified that Boyd was reaching into his car, while nearly all the residents of Larch Way backed up Appellants' version; Appellants' witnesses testified that Boyd begged the police not to shoot him and thought he was surrendering; two witnesses thought Boyd was in the process of surrendering; each side presented forensic testimony interpreting the scene of the shooting.  The jury had plenty of evidence to consider, and having heard the witnesses and judged their credibility, would have reached whatever decision the evidence best supported.

---

he committed on May 5, 2004; an expert opinion solely on the length of sentence would have sufficed.)  What Appellants do contest is the court's failure to bifurcate the trial in order to minimize the significant risk of unfair prejudicial posed by evidence relevant only to damages.  *See* Fed. R. Civ. Proc. §42(b).  As Appellants' counsel noted the bifurcation question was rendered meaningless by the admission of suicide-by-cop and all the evidence thereto.  ER 558-559.  If this Court vacates the jury's verdict and remands for a trial free of suicide-by-cop evidence, Appellants believe that bifurcation likely will be necessary.

Given the closeness of the evidence, anything that appeared relevant to what happened on Larch Way had the potential to tip the balance. For Defendants, that thing was the suicide-by-cop theory, which bore the seal-of-approval of court-anointed expert, Dr. Keram. Unlike the dozen or so eyewitnesses who testified at trial, Dr. Keram was not at Larch and had no direct exposure to what actually happened that day. Yet, her opinion came cloaked with "the aura of authority" and likely carried as much, if not more, weight than those who actually saw Officer Paine shoot and kill Cammerin Boyd. *See Elsayed Mukhtar,* 299 F.3d at 1063.

The district court recognized suicide-by-cop as the "lynch pin" to their case, and that "so much of what comes in [under suicide-by-cop] is very, very – it would be highly prejudicial to let in much of what you want to put in to support this defense." ER 452-53. Indeed, the court acknowledged that improperly admitting the evidence relied upon by Dr. Keram "would not be proper and you could all be trying this case again - if you got a defense verdict." ER 452. Although the trial lasted six weeks, featured dozens of witnesses, and presented complicated and often conflicting evidence, the jury rendered its unanimous verdict in just three hours.

50

When one considers the *cumulative* impact of the evidence admitted pursuant to suicide-by-cop and otherwise – all over Appellants' objections – the jury's quick verdict is hardly surprising. *See United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) ("Where, as here, there are a number of errors at trial, a balkanized, issue-by-issue harmless error review is far less effective than analyzing the overall effect of all the errors in the context of the evidence introduced at trial against the [losing party]."). Because it is more likely than not that the cumulative affect of this prejudicial evidence affected the outcome of the trial, the verdict should be vacated and the case remanded for a new trial. *See Elsayed Mukhtar*, 299 F.3d at 1068 (vacating jury verdict and remanding for new trial due to improper admission of expert testimony).

## <u>CONCLUSION</u>

For the reasons discussed above, the district court abused its discretion by admitting evidence that was irrelevant, unfairly prejudicial and likely to have confused and misled the jury. Because the cumulative effect of these improper

/ / /

/ / /

/ / /

/ / /

51

admissions was not harmless, the Court should vacate the jury's verdict in favor of

Defendants and remand for a new trial.

Dated: October 14, 2008            Respectfully Submitted,

                                       s/  Jay B. Shapiro

                                       Jay B. Shapiro
                                       FORMAN & ASSOCIATES
                                       4340 Redwood Highway, Suite E352
                                       San Rafael, CA 94903
                                       Telephone: (415) 491-2310

                                       Counsel for Plaintiff-Appellant
                                       Marylon Boyd

# CERTIFICATE OF COMPLIANCE

I certify that, pursuant to Federal Rule of Appellate Procedure 32(a)(7)(c) and 9th Circuit Rule 32-1, the attached answering brief is proportionately spaced, has a typeface of 14 points or more, and contains 11,674 words.

Dated: October 14, 2008            By:  s/   Jay B. Shapiro _____
                                        Jay B. Shapiro

## STATEMENT OF RELATED CASES

Appellant is not aware of any related cases pending in this circuit.