IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| MARYLON BOYD, individually and as Executor of the Estate of CAMMERIN BOYD, deceased, et. al., | No. 07-16993 |
| | (U.S. District Court No. CV-04-05459) |
| Plaintiffs/Appellant, vs. | |
| CITY AND COUNTY OF SAN FRANCISCO, et al., | |
| Defendants/Appellees. | |

**DEFENDANTS-APPELLEES ' ANSWERING BRIEF**

On Appeal from the United States District Court
for the Northern District of California

The Honorable Maxine M. Chesney

DENNIS J. HERRERA, State Bar #139669
City Attorney
JOANNE HOEPER, State Bar #114961
Chief Trial Deputy
BLAKE P. LOEBS, State Bar #145790
SCOTT D. WIENER, State Bar #189266
ERIN BERNSTEIN, State Bar #231539
Deputy City Attorneys
1390 Market Street, 7th Floor
San Francisco, California 94102-5408
Telephone:  (415) 554-3868
Facsimile:  (415) 554-3837

Attorneys for Defendants-Appellees

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................v

INTRODUCTION ...........................................................................1

JURISDICTIONAL STATEMENT ...................................................3

ISSUES PRESENTED FOR REVIEW ...............................................3

STATEMENT OF THE CASE...........................................................4

STATEMENT OF FACTS ................................................................4

    I.    BOYD'S LIFE CHANGED DRAMATICALLY WHEN HE
        LOSt HIS LEGS IN AN AUTO ACCIDENT AS HE FLED
        FROM THE CHP AT OVER 120 MPH AT NIGHT WITH HIS
        LIGHTS OFF. ....................................................................4

    II.   THREE DAYS BEFORE THE INCIDENT BOYD ENGAGED
        IN A HIGH-SPEED CHASE WITH POLICE, RESISTED
        ARREST, AND REPEATEDLY ASKED OFFICERS TO
        KILL HIM. .......................................................................5

    III.  THIRTY MINUTES BEFORE HIS DEATH, BOYD
        ATTEMPTED TO KIDNAP TWO WOMEN AT GUNPOINT
        AND ENGAGES IN A HIGH-SPEED CHASE WHERE HE
        SHOTS AT POLICE. ..........................................................6

    IV.  AT LARCH, BOYD REFUSED TO SHOW HIS HANDS
        AND DROVE FORWARD, FORCING OFFICER O'MALLEY
        TO FIRE AT HIM. ..............................................................9

        A.   Boyd Ignored Orders To Raise His Hands And Get On
            The Ground And, Instead, Reached Into His Suv As If To
            Grab A Gun...................................................................10

        B.   Other Witnesses Confirm That Boyd Refused To Follow
            The Officers' Orders And Was Reaching Into His SUV As
            If To Grab A Weapon When He Was Shot. ..............................14

            1.   Several Witnesses Testified That Boyd Was
                Reaching Into The SUV As If To Grab A Weapons
                When He Was Shot. .................................................14

2.     Testimony Of The Witnesses Who Claimed Boyd Was Not Reaching Into The SUV When He Was Shot Was Not Credible. ...................................17

C.     The Physical Evidence Conclusively Established That Boyd Was Reaching Into The SUV When He Was Shot. .........20

1.     Boyd's Bullet Wounds Established That When He Was Shot, He Was Reaching Into The SUV With At Least His Left Hand While He Was Sitting On The Running Board. .......................................20

2.     The Blood Patterns Found In The SUV Established That Boyd Was Reaching Into The SUV When He Was Shot. .................................................26

V.     PLAINTIFFS' CLAIM FOR DAMAGES. .........................28

STANDARD OF REVIEW ...................................................................29

ARGUMENT ......................................................................................30

I.     MOST OF THE EVIDENCE TO WHICH PLAINTIFFS OBJECT WAS PROPERLY ADMITTED FOR REASONS UNRELATED TO DEFENDANTS' "SUICIDE-BY-POLICE" THEORY. .......................................................................30

A.     Evidence Of Boyd's Attempted Kidnappings Of Williams And Hogan Was Relevant And Properly Admitted....................................................................30

B.     The Evidence Of The May 2, 2004 Oakland Incident Was Relevant And Properly Admitted. ....................32

C.     The Evidence Of Boyd's Past Convictions And His Likely Sentence From His April 2003 Armed Robbery Was Relevant And Properly Admitted. ....................34

D.     The Evidence Of How The 1993 CHP Accident Occurred Was Properly Admitted............................................34

E.     The Evidence Of The Drugs In Boyd's System At The Time Of The Incident Was Properly Admitted. ......................35

II.     ALL OF THE EVIDENCE TO WHICH PLAINTIFFS OBJECT WAS ALSO PROPERLY ADMITTED PURSUANT TO FRE 404(B). ...................................................................36

A.  The Evidence Of "Suicide-By-Police" Satisfied The Test For Admissibility Under 404(b). ..............................................37

    1.  The Evidence Tended To Prove That Boyd Was Reaching Into The SUV – The Key Issue At Trial. .......37

    2.  The Evidence Is Not Too Remote In Time. ...................40

    3.  The Evidence Is Sufficient To Support A Finding That Defendant Committed The Other Act...................41

B.  Keram's Expert Testimony Was Admissible Because It Passes The *Daubert* Standard. ..................................41

    1.  Keram's Testimony About Suicide-By-Police, And The Psychological Autopsy Supporting It, Grew Out Of Pre-Litigation Research, Was Based On Research Subjected To Peer Review, And Was Based On Objective Sources Recognized In The Psychiatric Profession.....................................43

    2.  Each Piece Of Evidence Challenged By Plaintiffs Supported Keram's Opinion That Boyd Committed Suicide-by-Police............................................48

C.  The Court Did Not Abuse Its Discretion In Allowing Keram To Testify Because She "Cherry-Picked"The Evidence.................................................................50

D.  Even If Error, Allowing Keram To Testify Was Harmless Because Defendants Could Have Argued That Boyd Committed Suicide-By-Police Based Solely On The Facts. ..........................................................................52

III.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY DECLINING TO EXCLUDE THE DISPUTED EVIDENCE UNDER RULE 403. ..................52

IV.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY DECLINING TO EXCLUDE THE DISPUTED EVIDENCE UNDER RULE 703. ..................52

V.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY DENYING PLAINTIFFS' MOTION TO BIFURCATE DAMAGES FROM LIABILITY................................53

VI.    BECAUSE OF THE OVERWHELMING PHYSICAL AND EYEWITNESS EVIDENCE THAT BOYD WAS REACHING INTO THE SUV AS IF TO GRAB HIS GUN WHEN HE WAS SHOT, ANY EVIDENTIARY ERRORS WERE HARMLESS. .......54

CONCLUSION ...................................................................................................55

STATEMENT OF RELATED CASES .................................................................56

CERTIFICATE OF COMPLIANCE ....................................................................56

# TABLE OF AUTHORITIES

**Federal Cases**

*Afshar v. City of Sacramento*
  2007 WL 779748 (E.D. Cal. March 14, 2007)....................................................53

*Billington v. Smith*
  292 F.3d 1177 (9th Cir. 2002)..................................................................39

*Blanchard v. Eli Lilly & Co.*
  207 F.Supp. 2d 308 (D.Vt.2002)..............................................................47

*Bowden v. McKenna*
  600 F.2d 282 (1st Cir. 1979)........................................................ 31, 38

*Campbell v. City of Leavenworth*
  13 P.3d 917 (Kan.App.2000)..................................................................46

*Campbell v. Young Motor Co.*
  211 Mont. 680 P.2d 1101 (1984) .............................................................48

*Cloud v. Pfizer Inc.*
  198 F.Supp.2d 1118 (D. Ariz.2001)...........................................................47

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*
  509 U.S. 579 (1993) ........................................... 2, 4, 41, 42, 43, 46, 48

*Davis v. Freels*
  583 F.2d 337 (7th Cir. 1978)................................................................53

*Gaido v. Weiser*
  227 N.J. Super. 175 (1988)..................................................................47

*Giles v. Wyeth, Inc.*
  500 F.Supp.2d 1048 (S.D.Ill.,2007) ............................................. 46, 47

*Graham v. Connor*
  490 U.S. 388 (1989) ...................................................................... 38, 39

*Grissom v. Union Pac. R. Co.*
   14 F.R.D. 263 (D. Colo. 1953) ........................................................................53

*Haddad v. Lockheed California Corp.*
   720 F.2d 1454 (9th Cir. 1983) .......................................................................55

*Hainze v. Richards*
   207 F.3d 795 (5th Cir.2000) ..........................................................................45

*Hamm v. American Home Products Corp.*
   888 F.Supp. 1037 (E.D.Cal.1995) .................................................................53

*Hangarter v. Provident Life and Acc. Ins. Co.*
   373 F.3d 998 (9th Cir. 2004) ................................................................. 29, 53

*Harman v. Apfel*
   211 F3d 1172 (9th Cir. 2000) ........................................................................29

*Harvey v. Raleigh Police Dept.*
   85 N.C. App.540 (1987) ................................................................................48

*Herrin v. Treon*
   459 F.Supp.2d 525 (N.D. Tex. 2006) ...........................................................48

*Hilao v. Estate of Marcos*
   103 F.3d 767 (9th Cir. 1996) .........................................................................29

*Horinek v. State*
   977 S.W.2d 696 (Tex.App. 1998) ..................................................................48

*Huddleston v. United States*
   485 U.S. 681 (1988) ......................................................................................36

*In re Estate of Hoover*
   155 Ill.2d 402 (1993) .....................................................................................47

*In re Succession of Pardue*
   915 So.2d 415 (La.App.2005) ........................................................................46

*Jackson v.* State
   553 So. 2d 719 (Fla.App.4 Dist. 1989) ........................................................48

*Kuhn Tire Co. v. Carmichael*
  526 U.S. 137 (1999) ...........................................................................29

*Lewis v. District of Columbia*
  793 F.2d 361 (D.C. Cir. 1986) ..........................................................35

*McLaughlin v. State Farm Mut. Auto. Ins. Co.*
  30 F.3d 861 (7th Cir. 1994).............................................................53

*Medeiros v. O'Connell*
  150 F.3d 164 (2d Cir.1998) ..............................................................46

*Old Chief v. United States*
  519 US 172 (1997) ...........................................................................30

*Palmquist v. Selvick*
  111 F.3d 1332 (7th Cir. 1993)................................... 38, 39, 40, 46

*Plakas v. Drinski*
  19 F.3d 1143 (7th Cir. 1994) ..................................................... 45, 46

*Robbins v. State*
  145 S.W.3d 306 (Tex.App.2004) .....................................................46

*Roshan v. Fard*
  705 F.2d 102 (4th Cir. 1983) ...........................................................36

*Saladino v. Winkler*
  609 F.2d 1211 (7th Cir. 1979)..........................................................35

*Smolen v. Chater*
  80 F.3d 1273 (9th Cir. 1996).............................................................51

*Southland Sod Farms v. Stover Seed Co.*
  108 F.3d 1134 (9th Cir. 1997)...........................................................42

*State v. Jackson*
  157 P.3d 660 (Kan.App. 2007)..........................................................46

*Succession of Werner v. Zarate*
  979 So.2d 506 (La.App.2007) ...........................................................47

*Sullivan v. State*
   898 So.2d 105 (Fla.App. 2005) ...........................................................45

*T.W.M. Custom Framing v. Industrial Comm'n of Ariz.*
   198 Ariz. 41 (2000) .........................................................................47

*United States v. Cruz–Garcia*
   344 F.3d 951 (9th Cir. 2003) ..........................................................36

*United States v. Curtin*
   489 F.3d 935 (9th Cir. 2007) ................................................. 29, 32

*United States v. Edouard*
   485 F.3d 1324 (11th Cir. 2007) .............................................. 31, 36

*United States v. Hinton*
   31 F.3d 817 (9th Cir. 1994) ............................................................40

*United States v. Houser*
   929 F.2d 1369 (9th Cir. 1990) ........................................................41

*United States v. Jackson*
   84 F.3d 1154 (9th Cir. 1996) ..........................................................36

*United States v. Multi-Management, Inc.*
   743 F.2d 1359 (9th Cir. 1984) ........................................................30

*United States v. Romero*
   282 F.3d 683 (9th Cir. 2002) ................................................... 37, 41

*United States v. Rrapi*
   175 F.3d 742 (9th Cir. 1999) ..........................................................36

*United States v. St. Jean*
   45 M.J. 435 (1996) ..........................................................................47

*United States v. Vizcarra-Martinez*
   66 F.3d 1006 (9th Cir.1995) .................................................... 31, 32

*White v. Ford Motor Co.*
   312 F.3d 998 (2002) ........................................................................29

*Yanco v. United Staes*
  45 Fed.Cl. 782 (Fed.Cl.2000)................................................................47

*Zanca v. Life Ins. Co. of North America*
  770 So.2d 1 (La.App.2000) ...............................................................47

*Zivkovic v. S. Cal. Edison Co.*
  302 F.3d 1080 (9th Cir. 2002) ..........................................................53

**State Cases**
*Alvarado v. Superior Court*
  146 Cal.App.4th 993 (2007)...............................................................46

*Benwell v. Dean*
  249 Cal.App.2d 345 (1967) ...............................................................31

*City of Simi Valley v. Superior Court*
  111 Cal.App.4th 1077 (2003)............................................................45

*Corder v. Corder*
  41 Cal. 4th 644 (2007).......................................................................31

**Federal Statutes**
42 U.S.C. § 1983 ........................................................................... 46, 53

Fed. R. Civ. P. 42(b) .........................................................................53

Fed. R. Evid. 401 ..............................................................................30

Fed. R. Evid. 402 ..............................................................................30

Fed. R. Evid. 404(b).................................................................. passim

Fed. R. Evid. 702 ..............................................................................42

Fed. R. Evid. 703 ..............................................................................52

# INTRODUCTION

On May 5, 2004, Cammerin Boyd attempted to kidnap two women at gunpoint, baited the police into a dangerous vehicle pursuit, shot at the police twice during the chase, got out of his car, and then, instead of surrendering, repeatedly reached into his car where the officers knew he had a loaded gun. After trying several times to get Boyd to surrender, and justifiably fearful that Boyd was reaching for his gun to shoot at them again, an officer shot Boyd.

After a six-week trial, a jury returned a defense verdict in under three hours. This was not because the trial court permitted Defendants to submit inadmissible evidence that Cammerin Boyd committed "suicide-by-police" as Plaintiffs allege, but because the overwhelming evidence established that when Boyd was shot, he was reaching into his car as if to grab a gun. Both parties' experts agreed that the shooting was justified if Boyd was reaching into his car when he was shot. The physical evidence, by itself, established *conclusively* that Boyd was reaching into his car when he was shot. Five police officers and three civilian witnesses confirmed this.

Plaintiffs now seek to throw out the jury's verdict by arguing that they did not get a fair trial. First, Plaintiffs assert that the district court abused its discretion by permitting Defendants to introduce evidence that Boyd committed suicide-by-police, which evidence in Plaintiffs' view, was aimed merely at establishing Boyd's bad character. Second, Plaintiffs argue that the district court further abused its discretion by permitting the expert testimony by Dr. Emily Keram that Boyd intentionally induced the police to shoot him, known as "suicide-by-police," which they assert was the "central issue" of this case.

Not only are Plaintiffs wrong in their contention that suicide-by-police was the central issue in this trial, but they also misstate the law and the facts as to

whether the court abused its discretion by admitting what Plaintiffs call the "suicide-by-cop evidence" and Dr. Keram's testimony.

Contrary to Plaintiffs' contentions, virtually all of the evidence to which they object was properly admitted to establish facts other than Boyd's intention to commit suicide-by-police. For example, evidence that Boyd had attempted to kidnap two women at gunpoint just moments before his death was admissible to explain why he became surrounded by police and to rebut Plaintiffs' contentions that Boyd did not have a gun and their claim for damages based on loss of Boyd's companionship.[1] Furthermore, evidence that Boyd spent years in prison was admissible to rebut Plaintiffs' contention — in support of their damages claim — that he was "always around" for his children and brought nothing but joy to his family.

Further of this evidence was admissible to corroborate the officers' version of events by providing an explanation for Boyd's actions that would otherwise be inexplicable. No one who did not have a death wish would have done what Boyd did — reach into his car as if to grab a gun when he had just shot at the police twice during a vehicle pursuit and when he had no chance of escape. This evidence was also properly admitted pursuant to 404(b) to establish that Boyd was "reaching" as part of his "plan" to be shot by the police.

In addition, the expert testimony of Dr. Emily Keram, a highly qualified psychiatrist with expertise in post-mortem evaluation of the mental state of deceased persons, was admissible under *Daubert.* Defendants were entitled to present expert testimony to the jury to support and explain their theory that Boyd committed suicide-by-police. And Dr. Keram provided ample basis to qualify as an

---

[1] As a result of Boyd's criminal activity on the evening of his death he would have likely spent life in prison had he survived.

expert in the field and to validate the scientific basis for the phenomenon. She also provided well-supported and well-reasoned opinions regarding Boyd's behavior.

Also, the court did not abuse its discretion by failing to bifurcate damages and liability because limiting instructions, had Plaintiffs requested them, would have been sufficient to solve any concern Plaintiffs had about jury confusion, and the evidence concerning damages was hopelessly intertwined.

Finally, because the evidence so overwhelmingly established Boyd was reaching, any error was harmless.

Accordingly, the judgment should be affirmed.

## JURISDICTIONAL STATEMENT

Defendants agree with Plaintiffs' jurisdictional statement.

## ISSUES PRESENTED FOR REVIEW

1.     Whether the district court abused its discretion by admitting evidence related to Cammerin Boyd's plan to commit "suicide-by-police" even though that evidence was admissible on several other independent grounds.

2.     Whether the district court abused its discretion by admitting the expert testimony of Dr. Emily Keram, a psychiatrist with extensive practical and academic experience in psychological autopsies and suicide-by-police.

3.     Whether the district court abused its discretion by declining to bifurcate damages issues from liability issues.

4.     Whether any evidentiary error was harmless in light of the overwhelming physical evidence and eyewitness testimony that Boyd led the police on a high-speed chase, shot at them twice, failed to surrender, and was reaching into his SUV at the time he was shot.

## STATEMENT OF THE CASE

On December 27, 2004, Plaintiffs sued the City and County of San Francisco, Officer Timothy Paine, and Officer James O'Malley, in district court.[2] Plaintiffs initially alleged numerous claims, including a federal claim of excessive force. (Complaint:ER89-110.) Defendants obtained partial summary judgment. (Order:Docket#211.) Plaintiffs' federal excessive force and related state claims remained.

Pre-trial the district court denied Plaintiffs' motion to bifurcate and conducted a *Daubert* hearing regarding expert witness Dr. Emily Keram and ruled that her testimony it was admissible. (Pretrial Conference Transcript:Docket##299-300;(DaubertTranscript:ER265-425.)

The case was tried to a jury for approximately six weeks. (Docket:ER646-51.) On September 24, 2007, the jury returned a verdict for Defendants in less than three hours. (Court:SER5133:5,5134:15-16;Verdict:ER3-5.)

## STATEMENT OF FACTS

### I. BOYD'S LIFE CHANGED DRAMATICALLY WHEN HE LOST HIS LEGS IN AN AUTO ACCIDENT AS HE FLED FROM THE CHP AT OVER 120 MPH AT NIGHT WITH HIS LIGHTS OFF.

In high school, Boyd was a promising collegiate-caliber athlete and honor student. (M.Boyd:SER1746:24-1756:24.) Everything changed in April of 1993, when a CHP officer attempted to pull Boyd over in the early morning hours for speeding on the 580 freeway. Instead of stopping, Boyd turned off his lights and increased his speed to over 120 mph, outrunning the officer. Attempting to exit the freeway, Boyd hit a light pole, injuring himself and his passenger. Both of Boyd's legs were amputated below the knees at the scene. (Carter:SER2541:1-2550:17.)

---

[2] Plaintiffs also named three other police officers who were dismissed.

After the accident, Boyd was convicted of two felonies and spent approximately four years jail. (Brass/Jail:SER2984:4-2998:4; M.Boyd:SER1814:11-20;Gonzalez:SER120:9-17.) In part due to Boyd's disability, he had a difficult time in prison. (M.Boyd:SER1817:21-1818:25.)

In April 2003, Boyd was arrested and charged with a third felony – two counts of assault with a firearm, and one count of felony possession of a firearm. (Brass:SER2998:5-3017:21.) Trial for Boyd's third felony was set to occur shortly after May 5, 2004. (M.Boyd:SER1820:15-1821:6.) According to expert testimony, the case against Boyd was strong. If convicted, Boyd faced a sentence of 15-26 years in prison. (Brass:SER2973:1-2984:3;SER2984:4-3017:21.)

Approximately two weeks before Boyd's death, San Francisco police officers investigating a series of robberies pulled Boyd over. In Boyd's car, the officers found rap lyrics written by Boyd accompanied by an article and photo regarding the funeral of an SFPD officer who had recently been murdered in the line of duty. One of Boyd's rap lyrics referred to "split a pig's wig," which means to kill a police officer. (Moody:SER2578:8-2583:11;Zackos:SER2569:20-2564:4.)

## II. THREE DAYS BEFORE THE INCIDENT BOYD ENGAGED IN A HIGH-SPEED CHASE WITH POLICE, RESISTED ARREST, AND REPEATEDLY ASKED OFFICERS TO KILL HIM.

On May 2, 2004, an Oakland police officer patrolling a festival noticed a new Mercedes — driven by Boyd and owned by his mother — driving in the middle turn lane of a city street at 70-80 miles per hour. The officer began pursuit, but Boyd pulled away, and the pursuit was terminated. (Seder:SER2468:25-2475:6).

A few minutes later, and two blocks away from the first encounter, Boyd reappeared in his vehicle and almost crashed into the officer's patrol vehicle. Boyd was shirtless, wide-eyed, sweating profusely, agitated, and gesturing wildly. Boyd

was again pursued, and led the pursuing officers into a residential area at a high speed. The officers again stopped the pursuit in light of Boyd's dangerously high speeds. (Seder:SER2469:1-2478:20.)

Shortly thereafter, officers encountered Boyd again in the same general area, driving at excessive speed. The officers blocked the street and forced Boyd to stop. Boyd got out of the car, and was ordered by the officers to show his hands and get down on the ground. He did so on his own, without any assistance. (Tolleson:SER2491:1-2494:21;Doolittle:SER2503:21-2504:16.)

Boyd struggled with the officers, but was ultimately handcuffed. While on the ground, Boyd repeatedly yelled "kill me." (Tolleson:SER2494:22-2497:2;Doolittle:SER2514:14-2515:8.) Boyd was then transported to a police station, where he continued to act bizarrely and yell "kill me." (Downing:SER2521:9-2522:23.) After this incident, Ms. Boyd bailed Boyd out of jail and rented a black Chevy SUV for Boyd her Mercedes was impounded. (M.Boyd:1836:14-1837:12.)

### III. THIRTY MINUTES BEFORE HIS DEATH, BOYD ATTEMPTED TO KIDNAP TWO WOMEN AT GUNPOINT AND ENGAGED IN A HIGH-SPEED CHASE WHERE HE SHOTS AT POLICE.

On May 5, 2004 from about 6:30-7:30 p.m., Boyd was with his mother and his aunt, Lois Boyd, in Oakland. Boyd told them that undercover San Francisco police officers were looking for him and were trying to kill him. (M.Boyd:SER1841:13-1842:5;L.Boyd:SER5159:8-5168:8.)[3] In response, his mother told him that she was going to fly him to Atlanta that night to keep him

---

[3] About a month before he was shot, Boyd told a high school friend that he believed the police were trying to kill him. (Hall:SER2599:10-2613:7.)

from a violent confrontation with the police.  (M.Boyd:SER1841:13-1842:5; L.Boyd:SER5159:8-5168:8.)

Marylon asked Lois to find a flight that night and told Boyd to give her the SUV keys so she could return it.  Boyd went to the SUV under the guise of retrieving items he needed.  At about 7:30 p.m., Lois and Marylon noticed that the SUV and Boyd were gone.  (L.Boyd:SER5169:20-5178:7.)

After taking off, Boyd drove to San Francisco.  One block from the Tenderloin Police Station, he began spinning "donuts."  Boyd then pulled up next to Tiffany Williams, a woman he did not know.  She approached the passenger door and opened it.  Boyd grabbed Williams, who pulled away.  Boyd then pointed a gun at her.  Williams ran up the street to get away.  Boyd put his SUV into reverse, going the wrong way down a one-way street, and followed Williams, yelling at her.  Williams ran into a store, and Boyd drove away. (Williams:SER5263:9-5279:1;SER5328:17-5334:9;Exh.W-7:SER5341,SER3109:14.)  According to Williams, Boyd was "angry," appeared to be under the influence of drugs and was acting "crazy or something." (Williams:SER5273:6-5278:23.)

Boyd next found Tatanika Hogan, a block away from the Northern Police Station, sitting in her car with her friend's teenage son.  (Jason:SER3911:19-3916:24;Exh.T5:SER5354,SER5146:22.)  Boyd, who was coming from the opposite direction, stopped his car next to Hogan's so their driver's windows were aligned.  Boyd, who appeared angry and under the influence of drugs, briefly talked to Hogan, then pointed a gun at her, and ordered her out of the car. Convinced that Boyd was going to shoot her, she begged Boyd to let her go and not to kill her.  A car came up behind Boyd and honked.  Boyd sped off down the block.  Hogan fled, running stop signs to get away from Boyd.  Boyd made a u-

turn and began coming back in Hogan's direction. (Hogan:SER5181:20-5209:23;Exh.D7:SER5212,SER3099:1-2;Exh.E7:SER5213,SER3099:1-2.)

Several blocks away, Hogan saw Officer Matthew Mason, who was completing an arrest. Hogan ran up to him and described, Boyd, his car and what had happened. (Hogan:SER5196:3-5201:23.) Officer Mason reported this over the police radio. (Mason:SER2410:10-25.)

Officer William Elieff heard the call and saw Boyd's SUV. Before he could activate his lights, Boyd fled. (Elieff:SER2856:9-2860:23.) Boyd led Officer Elieff and other officers on a high-speed chase through the Western Addition, at times driving on the wrong side of the street and at one point almost hitting a bicyclist. (Elieff:SER2860:24-2878:11.)

Shortly after the chase began, Boyd leaned out of his SUV and shot at Officer Elieff. (Elieff:SER2908:25-2909:4;Gatto:SER5215:2-5253-4;SER5256-5260.) At about that time, Officers Stearns and Kane joined the pursuit. (Stearns:SER400:5-18.) A few blocks later, he shot at the Officers a second time. Both shots missed. (Elieff:SER2908:25-2909:4.) One bullet he fired was recovered in the living room of a residence, having passed through a window at about head level. (Hawthorne:SER3205:25-3219:2;Sanchez:SER3578:11-19.)

Officers Timothy Paine and James O'Malley heard the broadcast of the pursuit and the shots fired at pursuing officers and attempted to intercept Boyd. At Pierce and Turk Street, Officer Paine stopped his vehicle and saw Boyd approaching from the left driving the wrong way down Turk Street at approximately 60 mph. (Paine:SER828:6-828:13;Jason:SER3916:25-3917:25.) From his vehicle, Officer Paine took a single shot at Boyd. Boyd ducked but did not stop or slow. (Paine:SER827:11-842:4.) Officer Paine's bullet penetrated the

hood of Boyd's car. (Jason:SER3920:5-3923:7.)[4] Officers Paine and O'Malley joined the pursuit. (Paine:SER842:5-858:6.)

With three police vehicles in pursuit Boyd drove to Larch Way ("Larch"), where he stopped his SUV, even though nothing was blocking his way and he could not flee on foot because of his disability. (Elieff:SER2878:19-20;Stearns:SER461:4-462:7;Dufauchard:SER351:22-352:9.) Larch is an "L" shaped residential street that cuts through a housing project. (Jason:SER3778:22-3782:23;Exh.V5-01(A):SER5351,SER4295:18-19.) By the time Boyd reached Larch, he had attempted to kidnap two women at gunpoint, murder of a police officer and engaged in felony evasion. If convicted of these crimes, Boyd probably faced life in prison. (Brass:SER3017:22-3021:14.)

## IV. AT LARCH, BOYD REFUSED TO SHOW HIS HANDS AND DROVE FORWARD, FORCING OFFICER O'MALLEY TO FIRE AT HIM.

Once Boyd stopped on Larch, Officers Elieff and then Stearns stopped their vehicles behind Boyd and sought cover behind a parked car west of Boyd's vehicle. (Elieff:SER2880:21-2882:7;Stearns:SER447:9-448:6). Officer Paine drove to the other end of Larch. Officer O'Malley got out first and approached Boyd on foot from the east. (O'Malley:SER230:15-22.)

When Officer O'Malley first saw Boyd in Larch, the SUV was stopped and Boyd's hands were out of view. Officer O'Malley took cover behind a vehicle and immediately ordered Boyd to show his hands and get out of his vehicle. Boyd did not comply. Instead, after making eye contact with Officer O'Malley, Boyd began to drive forward. (O'Malley:SER234:1-235:7.) Concerned that Boyd might begin shooting again or escape and jeopardize the lives of additional citizens and

---

[4] Although initially part of the case, Plaintiffs dropped any claim for liability regarding Officer Paine's shot at Turk and Pierce. (Closing:SER4880:24-4881:12,SER4985:16-4986:7;Instructions:SER5128:25-5129:5.)

officers, Officer O'Malley fired once at Boyd. (O'Malley:SER235:6-16).
Immediately after Officer O'Malley fired, other officers fired as well.
(O'Malley:SER241:-242:2.) After the shots were fired, Boyd brought his vehicle to
a stop. (O'Malley:SER241:2-242:2;Campos:SER2289:10-
2304:5;Harris:SER1079:9-15;Cranshaw:SER1546:22-1547:24;Jason:SER3923:8-
3929:10;Exh.F9(A):SER5355;SER5147:5.) Boyd then exited the vehicle
uninjured. (O'Malley:SER242:15-244:11;Campos:SER2401:4-9.)

### A. Boyd Ignored Orders To Raise His Hands And Get On The Ground And, Instead, Reached Into His Suv As If To Grab A Gun.

To orient the Court as to what happened on Larch, scaled diagrams of Larch
that show Boyd's SUV where it was stopped when he got out of the car are
included in this record. (Jason:SER3778:22-3782:23;Exh.V5-
01(A):SER5351;Exh.V5-02(A):SER5352,SER4295:18-19.)

/ / /

/ / /

The close-up version is shown below.



Officers Elieff and Stearns were taking cover behind the grey car parked furthest west of Boyd when they saw Boyd get out of the SUV. (Elieff:SER2882:6-2883:24;SER2920:12-24;Stearns:SER464:3-466:5;Exh.V5-02(A):SER5352.) Officer O'Malley had taken cover behind the red car north-west of Boyd. (O'Malley:SER83:13-23;Exh.V5-02(A):SER5352.) The officers immediately began yelling at Boyd to raise his hands and get on the ground. (Elieff:SER2886:6-2887:8;Stearns:SER466:9-466:13.)

Instead of complying, Boyd took off his shirt[5] and waived his arms yelling. (Elieff:SER2886:25-2888:10.) Officer Elieff heard Boyd yell "you want to shoot

---

[5]Officer O'Malley recalled Boyd pulling at this shirt and Officer Stearns recalled Boyd pulling at his waistband. (O'Malley:SER242:15-243:4;Stearns:SER406:3-4,SER466:9-470:12.)

me, come on and shoot me." (Elieff:SER2889:17-2890:24.) Boyd then walked back to the open door of the SUV. (Elieff:SER2893:12-21;Stearns:SER472:2-4;O'Malley:SER242:15-24.)

As Boyd got near the open door of the SUV, Officer Paine and Officer Scott Warnke approached on foot from the east. (Paine:SER856:12-862:4;Warnke:SER1254:13-1255:3.) Officer Paine stopped on the north sidewalk between the two red cars just west of No. 618 (Exh.V5-02(A):SER5352) with only an empty parking space between him and Boyd. (Paine:SER862:5-864:11.) Officer Warnke stopped just east of Officer Paine in an open parking stall. (Warnke:SER1355:20-1357:1.)

Officer Paine immediately began yelling for Boyd to put his hands up and get down to the ground. (Paine:SER864:18-23.) The officers were concerned that Boyd was returning to the SUV to retrieve his gun (Elieff:SER2893:12-2896:3;Stearns:SER472:2-473:25;O'Malley:SER247:17-22;Paine:SER866:16-867:3) – which was still in the SUV.[6]

When Boyd got back to the SUV, he sat on the running board with his feet on the ground. (Elieff:SER2893:12-2895:13;Stearns:SER474:1-22;O'Malley SER245:7-10;SER250:19-251:12.)[7] The officers became increasingly concerned that Boyd was attempting to get a gun from the SUV and continued to yell at him to get to the ground and raise his hands. (Paine:SER866:16-867:3.)

---

[6] Shortly after the incident a loaded gun was recovered from the driver's side map pocket; the bullet recovered from the home next to the path of the pursuit matched bullets fired from that gun. (Gee:SER3732:5-3736:18, Jonas:SER2431:11-2438,Sanchez:SER3578:11-19.)

[7] Officer Paine recalls Boyd sitting in a semi-seated position. (Paine:SER865:20-866:15.) Officer Warnke could not recall seeing Boyd seated, but his view was blocked by the door. (Warnke:SER1315:10-14.)

While Boyd was sitting on the running board, the officers saw him reach to his left, inside the SUV. (Elieff:SER2896:22-2897:14;Stearns:SER474:23-475:17;O'Malley:SER254:25-255:19;Paine:SER894:4-17.) The officers were convinced Boyd was reaching for a gun. (Elieff:SER2896:22-2897:16;Stearns:SER474:23-475:17;O'Malley:SER254:25-255:20);Paine:SER894:4-895:5;Warnke:SER1367:22-1368:12.) They yelled at Boyd to put his hands up. (Paine:SER895:3-5.) Fearing for their lives, Officers Stearns, O'Malley and Paine were just about to shoot. Before they could fire, Boyd turned back around. The Officers then saw that he did not have a gun in his hands and held their fire. (Stearns:SER474:23:-476:18;O'Malley:SER254:25-255:19;Paine:SER894:4-895:5.)

Officer Paine thought Boyd seemed unconcerned, as if he was on drugs. (Paine:SER890:20-891:22.) Officer Paine then saw Boyd's expression change "as if a light bulb went off in his head." (Paine:SER895:22-896:18.) Officer Elieff described this change in Boyd's expression as if "he made up his mind he was just going to do it" and saw Boyd take a deep breath. (Elieff:SER2898:16-2900:18.)

Then, Boyd made another movement to his left, reaching with both hands back into the SUV, which some of the officers described as a bigger, faster movement. (Elieff:SER2898:16-2902:12:O'Malley:SER255:20-257:3;Paine:SER895:22-896:18;Wanke:SER1374:15-1375:15). The officers lost sight of Boyd's hands. (Elieff:SER289:16-2902:12;Stearns:SER476:19-478:16;O'Malley:SER255:20-257:3;Paine:SER899:4-22;Warnke:SER1374:15-1375:15.) Believing Boyd was reaching for his gun, Officer Stearns started to squeeze his trigger. (Stearns:SER476:19-477:8.) Officer O'Malley could see that Boyd was reaching under the driver's seat and thought Boyd would soon have a gun in his hands again. (O'Malley:SER255:20-257:3,258:14-259:18.) Also

fearing for his life, Officer Warnke was lining up his sights. (Warnke:SER1374:13-1378:23.)

Officer Paine, who was directly across from Boyd and had no cover, was the first to act. Believing Boyd was about to produce a gun from the SUV and shoot him and the other officers, Officer Paine fired rapidly three times. (Paine:SER865:10-12;896:19-899:22.) Both of Boyd's hands were out of Officer Paine's view when he fired. (Paine:SER899:4-22.) Seeing that the threat had been stopped, the other officers held their fire. (Stearns:SER477:3-8;O'Malley:SER259:10-18;Warnke:SER1374:13-1378:23.)

Each officer testified that when Officer Paine fired, Boyd was reaching inside of the SUV. (Paine:SER899:4-22;Elieff:SER2902:1-2903:12;Stearns:SER476:19-477:8;O'Malley:SER259:10-18;Warnke:SER1378:17-23.) Testing of Boyd's blood and urine after his death revealed the presence of methamphetamine, marijuana, and MDA, an amphetamine related to MDMA (ecstasy). (Lemos:SER2640:20-2642:21.) These drugs can cause aggressive and bizarre behavior and post-intoxication depression, which can lead to suicide. (Mendelson:SER2825:13-2830:11.)

### B. Other Witnesses Confirm That Boyd Refused To Follow The Officers' Orders And Was Reaching Into His SUV As If To Grab A Weapon When He Was Shot.

#### 1. Several Witnesses Testified That Boyd Was Reaching Into The SUV As If To Grab A Weapons When He Was Shot.

Joe Campos – who was looking out the window of his home at 618 Larch, directly across from Boyd's SUV – testified that after Boyd got out of the SUV, the officers yelled at Boyd, telling him to raise his hands and get down to the ground. (Campos:SER2287:19-2295:5.) Boyd did not get to the ground as ordered and, instead walked toward the back of his SUV and yelled at the officers, "shoot me, you can shoot me." (Campos:SER2299:15-2300:23.)

According to Campos, Boyd then walked to the open driver's door and sat down on the edge of the SUV next to, but below the driver's seat, thighs parallel to the ground, facing toward the back of the SUV.  (Campos:SER2302:25-2307:8.) Shortly after sitting down, Campos saw Boyd look to his left, then reach to his left, as if he were trying to grab something from inside the SUV.  (Campos:SER2306:1-2309:12.)  The officers yelled even louder for Boyd to put his hands up.  Boyd pulled back.  (Campos:SER2309:8-2310:10.)

After a few moments, Campos saw Boyd look to his left again, as if he were still looking for something in the area of the driver's seat.  (Campos:SER2310:17-2311:13.)  The officers continued to yell at Boyd.  (Campos:SER2312:25-2313:2.) Then Boyd reached into the SUV a second time.  This time, according to Campos, Boyd made a bigger movement, in which Boyd actually reached across his body into the SUV and in front of the driver's seat.  (Campos:SER2311:14-2313:19.)  At this point, *while Boyd was reaching into the SUV with both hands*, Campos heard shots being fired.  (Campos:SER2311:14-2313:19.)  He then saw Boyd grab his stomach and fall out of the SUV.  (Campos:SER2314:13-2316:16.)[8]

Similarly, Carlyce Ingram —who saw the incident from his third story window at 648 Larch (Ingram:SER1682:25-168:3,SER1701:7-20) – testified that when he first saw Boyd, Boyd was out of his SUV, with his back to his SUV, and police officers were shouting at him.  (Ingram:SER1701:21-1702:16.)  As officers were shouting at Boyd, Ingram saw Boyd turn to his left, towards the SUV. (Ingram:SER1702:20-1703:6.)  As Boyd turned away from the officers to his SUV,

---

[8] Marylon Boyd attempted to intimidate Campos into not testifying by, among other things, making it known in his neighborhood that he was cooperating with the police.  As a result, his deposition and trial testimony only became possible after Campos and his family had moved from Larch. (Campos:SER2319:8:5-2328:1.)

his hands quickly went inside the SUV, near the edge of the driver's seat.
(Ingram:SER1709:18-1710:13.)

According to Ingram, Boyd disobeyed the officers' commands and they
seemed increasingly concerned. (Ingram:SER1702:20-1703:6;SER1708:23-
1709:4.) After the officers yelled at Boyd again to show his hands and get down
on the ground, Boyd turned back towards the officers again and squatted next to
the SUV. (Ingram:SER1710:14-19.) The officers continued to yell at Boyd but
Boyd again turned and put both of his hands into his SUV. (Ingram:SER1710:20-
1711:21.)[9] According to Ingram, "within a blink of an eye" after Boyd turned and
put his hands into the SUV the last time, the shots were fired.
(Ingram:SER1711:22-1712:6.)

Finally, Fatima Wilson, who witnessed the shooting from her first floor
apartment at 638 Larch (Wilson:SER2689:3-2699-22;Exh.V5-02(A):SER5352),
testified *reluctantly*[10] that at the time the shots were fired, Boyd was leaning into
his SUV and reaching in front of the driver's seat of the SUV with both of his
hands "to try to get something." (Wilson:SER2715:16-2719:7;SER2771:4-12.)

---

[9] At trial Ingram testified that he thought Boyd was merely "bracing" himself
and not reaching into the SUV. This testimony was impeached with his repeated
statements in his deposition that Boyd appeared to be reaching into the SUV.
(Ingram:SER1701:3-1745:14.)

[10] Wilson acknowledged that she saw Boyd reaching only after being
impeached repeatedly with her prior statements. (Wilson:SER2715:16-
2719:7;SER2771:4-12.) Much of Wilson's other testimony was also impeached
numerous times. (Wilson:SER2690:18-2752:25,SER2770:25-2771:12.) Prior to
her testifying, Wilson admitted to having meet with Marylon Boyd a numbers of
times, including attending three candlelight vigils for Boyd. She was also given a
disposable camera by Ms. Boyd and agreed to take photographs to help her with
this litigation. (Wilson:SER2693:9-2697:12.)

2.  **Testimony Of The Witnesses Who Claimed Boyd Was Not Reaching Into The SUV When He Was Shot Was Not Credible.**

Four witnesses – Otis Harris, Mario Rogers, Michelle Cranshaw, and Betrice "Tootsie" Jackson – testified that at the time Boyd was shot he was not reaching into the SUV. All of their testimony suffered from similar defects.

First, their testimony was inconsistent with each other. Harris testified that when Boyd was shot, he was standing erect, facing Officer Paine with both hands raised. (Harris:SER996:14-997:2,SER1088:21-1084:1,SER1104:24-1106:18.) According to Rogers, Boyd was almost seated on the running board, facing Officer Paine with both hands raised. (Rogers:SER1450:19-1452:5,SER1410:2-16, SER1463:10-1468:15;Exh.E-8:SER5343;SER1478:19.) Cranshaw stated that Boyd was standing, and his right hand raised and his left hand moving down towards the inside of the SUV just above waist level. (Cranshaw:SER1551:20-1553:20.) According to Jackson, Boyd was standing with both hand raised. (Jackson:SER1585:14-1586:11.)

Second, their testimony conflicted with the testimony of other witnesses and their own deposition testimony and/or previous statements and, in many instances, was incredible on its face. (Harris:SER1013:23-1127:20;Rogers:SER1413:1-1478:19;Cranshaw:SER1532:1-1559:3;Jackson:SER1591:20-1609:3,SER1612:5-1618:11.) For example, Harris testified that during the incident, he moved from being 10 apartment units away (at 650 Larch) to being on the sidewalk 15 feet away from Boyd when he was shot – which would put him virtually on top of Officer O'Malley. (Harris:SER1076:17-1077:9,SER1079:16-1081:18;O'Malley:SER83:13-23;Exh.V5-01(A):SER5351.) But Rogers testified that Harris stayed with him, 10 apartment units west of where Harris claimed to be. (Rogers:SER1476:16-1478:12;Exh.V5-01(A):SER5351.)

Meanwhile, Rogers claimed that he saw everything, even though he was 10 apartments west of Boyd, busy traveling down three flights of stairs and talking to neighbors. (Rogers:SER1412:3-7,SER1460:14-1462:20,SER1476:16-1478:12;Exh.V5-01(A):SER5351.) Similarly, Cranshaw, who was on the opposite side of the street, testified that she saw things that she could not have seen and that no other witness saw. (Cranshaw:SER1544:1-1545:9,SER1548:16-1549:25;Exh.V5-02(A):SER5352.)

Finally, although Jackson testified on direct that she saw what Boyd was doing just before he was shot, she then admitted in cross-examination, as she had done in her deposition, that she *could not see what Boyd was doing because she was looking in the opposite direction*. (Jackson:SER1591:20-1599:25;Exh.V5-02(A):SER5352.) Also, contrary to her trial testimony, Jackson told a friend that she saw Boyd reaching into the SUV when he was shot. (Wilson:SER2693:1-6,SER2748:22-2753:13.)

Many of these witnesses also had a long history of negative experiences with the San Francisco Police. Harris had over 150 felony arrests by the SFPD, many convictions, had been shot at once by the SFPD and served eight years in prison as a result of an SFPD arrest for something he claims he did not do. (Harris:SER1012:23-1013:9;SER1041:20-1042:1.) He had recently filed an excessive force lawsuit against the SFPD – something he denied doing even after a copy of his complaint was admitted in evidence. (Harris:SER1055:23-1058:24.) Rogers had been arrested many times by the SFPD (one of which resulted in a felony conviction). (Rogers:SER1421:25-1422:10.) Cranshaw had been arrested by the SFPD and was convicted for fraud in 2007. (Cranshaw:SER1543:18-24.) In reference to her opinion about the officers who patrol Larch, she previously she

had said that "they need to fire the whole squad over there," although at trial she denied saying that. (Cranshaw:SER1540:8-1543:17.)

At the same time, all four of these witnesses had extensive contacts with Marylon Boyd and her family. Harris knew Marylon Boyd, attended meetings, and worked with her on her "campaign" related to her son's death. (Harris:SER1865:18-1867:11;M.Boyd:SER1865:18-1867:11.) Rogers denied being a part of Marylon's "campaign" or attending meetings with her, but was contradicted by Marylon herself. Rogers also knew Marylon's sister and went to school with her brother. (Rogers:SER1431:17-1434:9,M.Boyd:SER1865:18-1867:11.) Cranshaw only came forward to give a statement two and a half years after the incident and only after she had met several times with Ms. Boyd, her representatives, and her lawyers. (Cranshaw:SER1532:8-12,SER1538:15-1539:24.) Jackson was friendly with Marylon Boyd's brother, attended a candlelight vigil for Boyd, and before she testified, discussed the incident with Ms. Boyd. (Jackson:SER1600:1-22.)

Finally, and most significantly, their description of Boyd's body position when he was shot was impossible in light of the physical evidence. As explained below, the physical evidence conclusively established that, at the time he was shot: (1) Boyd could not have had his hands raised; (2) Boyd could not have been standing; and (3) Boyd could not have been face-to-face with Officer Paine.[11]

---

[11] Each of these witnesses also testified that they heard Boyd say that he could not get to the ground. (Harris:SER990:12-20;Rogers:SER1408:21-25;Cranshaw:SER1520:16-22;Jackson:SER1584:20-25.) Boyd, however, did not appear disabled to any of them. (Harris:SER1116:9-16;Rogers:SER1468:21-1469:2;Cranshaw:SER1556:10-14;Jackson:SER1603:20-1604:1.) No officer heard Boyd say that he could not comply with their orders, nor did he appear in anyway disabled to them either. (Elieff:SER2896:15-21;Stearns:SER472:9-11;O'Malley:SER241:10-16;Paine:SER760:18-21,SER778:18-20.) Dr. Bradshaw, who specialized in physical medicine and rehabilitation, confirmed that Boyd could get to the ground by bend his legs and doing a controlled dive. (Bradshaw:SER3122:15-3148:6.)

**C.** **The Physical Evidence Conclusively Established That Boyd Was Reaching Into The SUV When He Was Shot.**

    **1.** **Boyd's Bullet Wounds Established That When He Was Shot, He Was Reaching Into The SUV With At Least His Left Hand While He Was Sitting On The Running Board.**

According to Dr. Smith, the San Francisco medical examiner who did Boyd's autopsy, Boyd was struck by at least two bullets, producing three bullet wounds.[12] One bullet, which experts for both sides believed was the first bullet to strike Boyd (Bonnell:SER685:11-18;Jason:SER3898:5-23), produced two bullet wounds. This bullet first struck Boyd on the top of Boyd's left thigh just above the knee and exited on the outside of his thigh. (Smith:SER3259:10-3278:23,Smith: SER3282:18-3285:2.)

/ / /

/ / /

---

[12] Dr. Smith also found a wound to Boyd's head that was "suggestive of a gunshot wound." But he further testified that Boyd had several other scrapes and abrasions that were hours to days old and this injury could just as easily have been from a scrape to his head from a few days before. (Smith:SER3311:5-3312:10;Smith:SER3314:9-3315:6.)

The location of this bullet wound is shown by the green arrow in the trial exhibit below (Exh.V-8:SER5348,SER3296:15-3297:3) which was admitted for demonstrative purposes. (Smith:SER3301:22-3303:4;Jason:SER3806:1-3809:25;Exh.U(1):SER5346,SER3454:5.) This graphic shows the body in the "anatomic position," which is a uniform body position used by medical examiners to describe directionality and location of wounds. (Smith:SER3275:1-6.)



After leaving his thigh, this same bullet lodged in his left hand. (Smith:SER3285:3-3287:3.) This second bullet wound caused by the same bullet is shown by the yellow arrow on the above trial exhibit. (Smith:SER3301:22-3303:4;Jason:SER3806:1-3809:25;Exh.U(1):SER5346.) Although Plaintiffs disputed whether the same bullet that passed through Boyd's left leg lodged in his

left hand, this fact was conclusively established through fibers that were recovered from the bullet in Boyd's left hand. These fibers matched the fibers of the jeans and boxer shorts Boyd was wearing, which had corresponding holes in them. (Sacks:SER3628:1-3629:9;Springer:SER3651:14-3657:18,SER3664:18-3665:23,SER3675:4-8,SER3680:1-8,SER3682:13-3683:8.) The *only way* that those fibers could have gotten on the bullet is if that bullet first passed through Boyd's left leg. (Springer:SER3688:17-3690:18.)[13]

The second bullet that struck Boyd hit the right side of his torso and traveled at about elbow level to his left side at a 10-15% downward trajectory toward his back. (Bonnell:SER701:24-702:19;Smith:SER3280:3-3282:18.) This bullet wound is shown by the blue arrow on the exhibit above. (Smith:SER3301:22-3303:4;Jason:SER3806:1-3809:25;Exh.U(1):SER5346.) Both bullets came from Officer Paine's gun. (Sanchez:SER3544:21-3546:18.)

This physical evidence established five facts:

First, it established that Boyd's left hand was lowered below his waist and behind his left thigh when he was shot. A bullet fired from Officer Paine's height would have a downward trajectory in order for it to strike Boyd in the left thigh, just above the knee. (Bonnell:689:18-690:2;Jason:SER3907:19-3908:23;3908:24-3910:11.) For the trajectory of the left thigh wound to match the downward trajectory from Officer Paine's height, Boyd's left leg would have to be roughly parallel to the ground – as if sitting. (Smith:SER3346:10-334:25,SER3482:17-

---

[13] Dr. Bonnell, the medical examiner expert retained by Plaintiffs, hypothesized that the bullet recovered from Boyd's left hand could have first hit Boyd in the head, as opposed to first hitting him in the left thigh. (Bonnell:SER672:10-19.) Dr. Bonnell admitted, however, that this theory would be disproven by the existence of fibers from Boyd's jeans and boxer shorts found on the bullet recovered from his left hand and further conceded that he had not been provided with this evidence. (Bonnell:SER694:1-696:4.)

3483:2;Bonnell:SER686:7-687:6;Jason:SER3907:19-3910:11.)  And, after passing through Boyd's left thigh, the bullet would have continued to travel downward. Because the bullet then struck Boyd's left hand, Boyd's left hand must have been behind his left thigh and lower than the exit wound to his thigh. (Smith:SER3315:18-3317:14;Bonnell:SER698:2-700:12.)

Second, this evidence established that Boyd was sitting when he was shot. For Boyd to have sustained the bullet wound to his left thigh from a standing shooter, Boyd's left thigh would have to be flexed so that it was roughly parallel to the ground.  (Bonnell:SER686:7-687:6;Jason:SER3907:19-3910:11.)  Given the bullet wound paths and Boyd's prosthetic legs, Boyd could *only* have been sitting with his thighs parallel to the ground when he was shot.  (Smith:SER3346:10-3347:25.)

Third, it established that Boyd was seated at a height consistent with the running board of the SUV when he was shot.  Both the downward trajectory of the wounds and the location of Officer Paine when he fired confirm this.  With Boyd in a sitting position, the wound to his left leg and abdomen would be at approximately the same downward trajectory as a bullet fired from Officer Paine at the location where the evidence established he was when he shot. (Paine:SER552:11-17;558:20-559:8;Jason:SER3901:14-3902:11,SER3907:19-3910:11; SER4337:23-4339:18;Bonnell:SER686:7-687:6;SER701:24-702:19.)

Fourth, this physical evidence established that Boyd's right side was turned to Officer Paine when he was shot.  The entrance wound for the bullet wound to Boyd's abdomen was in his right side and traveled from right to left .  This could only occur if Boyd's right side was turned toward Officer Paine when the shot was fired.  (Bonnell:SER701:24-702:19;Smith:SER3280:2-3282:18;Exh.U(1):SER5346.)

Finally, Boyd's bullet wounds are aligned so that they trace back to one shooter, in one location, Boyd could only have been in one position and one location — sitting on the running board of the SUV and turned to his left, reaching with his left hand below the exit wound in his left thigh.  (Smith:SER3351:21-3353:12;Jason:SER3845:21-3848:6;Exh.U(2):SER5347,SER3454:22; Smith:SER3456:3-3859:2.)[14]

/ / /

/ / /

---

[14] Jason, a shooting reconstructionist, testified that he believed that the third bullet fired by Officer Paine, which was never recovered, went over Boyd's head and through the SUV windshield.  (Jason:SER3756:8-3787:16,SER3821:1-3845:3,SER3896:7-3898:4,SER3910:20-3912:18.)

This was illustrated in the demonstrative exhibit below, which shows Boyd's bullet wounds in the Anatomic Position in the top left corner and those same bullet wounds as they line up with his body in the SUV, sitting on the running board, turning left.   (Smith:SER3354:17-3356:5;Jason:SER3456:3-3859:2;Exh.W-8:SER5349;SER3354:5.)



/ / /

/ / /

This was also illustrated by the photograph below, which depicts a person of comparable size to Boyd sitting on the running board of *the* SUV.  The yellow dots represent the approximate location of the entrance wounds of the two bullets that struck Boyd.  (Jason:SER3859:18-3867:9,SER3881:15-3884:4;Exh.U5:SER5353, SER4315:3.)[15]



### 2.    The Blood Patterns Found In The SUV Established That Boyd Was Reaching Into The SUV When He Was Shot.

Alexander Jason, a crime scene analyst and blood pattern expert, testified that there was blood inside the SUV in front of the driver's seat, some of which was "high velocity blood," consistent with blood expelled from a gunshot wound.

---

[15] The actual hole in the windshield caused by Officer Pain's third shot is depicted in this photograph, just above the dashbord. (Jason:SER4312:4-15)

(Jason:SER3756:8-3787:16,SER3821:1-3845:3;Exh.B2-48(1):SER5350, SER3822:20-21.)  Jason also testified that the location, directionality, amount, direction and size of the blood stains were exactly what would be expected if Boyd's left hand had been struck by a bullet as his hand was inside the SUV, reaching in front of the driver's seat.  (Jason:SER3821:1-3845:3.)  These stains could not have been made had Boyd been standing outside of the SUV when he was shot, with his arms raised.  (Jason:SER3898:24-3899:10.)

Plaintiffs called Dr. Mark Firestone to rebut Jason's blood spatter analysis. Firestone, however, was unqualified to do so, having: (1) never taken a class in blood pattern analysis; (2) never been to a crime scene to analyze blood patterns; (3) never worked as a criminalist; and (4) never taught, written about or conducted any experiments concerning blood pattern analysis.  (Firestone: SER2143:2-5,SER2143:19-23,SER2144:19-2145:13.)  On cross examination, he admitted that he did not know the most basic information about blood pattern analysis, such as the name of red blood cells (erythrocytes) or white blood cells (leukocytes), or the size or shape of falling blood.  (Firestone:SER2145:22-2148:25;Jason:SER3820:16-20;Jason:SER3814:19-3816:25;Jason:SER3817:4-3820:15;Jason:SER3821:2-4.)  Without this knowledge, it was impossible for Firestone to do any meaningful analysis of blood patterns because he had no starting point for an analysis.  (Jason:SER3816:10-25,SER3817:25-3819:12.)

Even if qualified, Dr. Firestone did not do the work necessary to offer informed opinions about the blood patterns in this case.  He formed his opinions before seeing *any* blood related evidence (Firestone:SER2128:23-2135:25) or examining the SUV, the scene of the incident, or even any photographs of the blood.  (Firestone:SER2128:23-2135:25.)  Indeed, he never went to the scene,

examined the SUV or any of the physical evidence. (Firestone:SER2133:20-22,SER2136:6-11,SER2141:18-20,SER2169:1-4,SER2170:25-2171:10.)

**V.      PLAINTIFFS' CLAIM FOR DAMAGES.**

Plaintiffs sought damages for the "loss of Cammerin Boyd's love, companionship, comfort, care, assistance, protection, affection, society and moral support." (Instructions:SER5125:17-5126:2.)

Ms. Boyd testified that at the time Boyd lost his legs in the 1993 accident he was a promising athlete and honor student. (M.Boyd:SER1746:24-1756:24.) On direct Ms. Boyd spoke at length about how tragic the accident was, implying that her son was an innocent victim. On cross-examination, she denied that the accident happened as a result of Boyd fleeing from the CHP – even though she was her son's attorney in his lawsuit against the CHP for that accident. (M.Boyd:SER1746:24-1869:6,SER1804:10-1805:1,SER1810:10-1812:13.)

Ms. Boyd also testified that Boyd was "a very kind and generous young man. Very outgoing. Very well liked." (M.Boyd:SER1754:19-21.) Ms. Boyd noted that when he was playing sports and another athlete was hurt, Boyd "was the first one there trying to make sure that person was okay." (M.Boyd:SER1754:19-1755:3.) Ms. Boyd also testified that after Boyd lost his legs he "adjusted quickly to figuring out how he could live his life." (M.Boyd:SER1757:24-1758:2.)

Ms. Boyd also testified that she was devastated by the loss of her son, in part because "we'll never be able to do many of the things that I hoped that we would do in our lifetime." (M.Boyd:SER1791:6-15.) Ms. Boyd stated how, because of the shooting, neither she nor his daughters would be able to spend the holidays with Boyd ever again. (M.Boyd:SER1782:14-1787:22.) Plaintiffs introduced photographs of Boyd playing sports, laughing and playing with his children and opening gifts on Christmas. (M.Boyd:SER1747:3-17,SER1762:15-1766:11.)

Isabel Boyd, who was five years old when her father died, testified that she feels sad because her father is no longer with her and feels especially sad when she sees other children with their fathers. (Isabel:SER126:3-127:4.)

Isela Gonzalez (Isabel's mother) testified that Boyd was always there for his daughter, Isabel. Gonzalez stated that "he played with her, he did everything he could for her, and she, you know, knew her daddy was always there." (Isela:SER108:11-16.) Ms. Gonzalez admitted, however, that Boyd was in prison for the entire second year of his children's lives.[16] (Isela:SER120:9-17.)

## STANDARD OF REVIEW

The district court's evidentiary determinations and decision to deny bifurcation are reviewed under an abuse-of-discretion standard. *See Kuhn Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) (admission or exclusion of expert testimony); *White v. Ford Motor Co.*, 312 F.3d 998, 1007 (2002) (same); *U.S. v. Curtin,* 489 F.3d 935, 943 (9th Cir. 2007) (decision to admit Rule 404(b) evidence); *Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998, 1021 (9th Cir. 2004) (bifurcation); *Hilao v. Estate of Marcos*, 103 F.3d 767, 782 (9th Cir. 1996) (bifurcation).

A reviewing court will not reverse a district court decision for abuse of discretion unless it is firmly convinced that "the reviewed decision lies beyond the pale of reasonable justification under the circumstances." *Harman v. Apfel*, 211 F3d 1172, 1175 (9th Cir. 2000).

---

[16] Isabel Gonzalez and Kanani Boyd were born two months apart and were five years old when Boyd was shot. (Isela:SER120:6-8;KamilahBoyd:SER2177:20-22.)

## ARGUMENT

**I.   MOST OF THE EVIDENCE TO WHICH PLAINTIFFS OBJECT WAS PROPERLY ADMITTED FOR REASONS UNRELATED TO DEFENDANTS' "SUICIDE-BY-POLICE" THEORY. [17]**

"All relevant evidence is admissible, except as otherwise provided by [law]." FRE 402.  Evidence is relevant if it tends to make the existence of any fact that is of consequence to the action more probable or less probable.  FRE 401; *Old Chief v. United States* 519 US 172, 179, 117 S.Ct. 644, 649–650 (1997).  Where evidence objected to was admissible on other grounds, and no limiting instruction was requested, there is no basis to challenge the admission of that evidence on appeal.  *See, e.g.*, *U.S. v. Multi-Management, Inc.*, 743 F.2d 1359,1364 (9th Cir. 1984) (where no limiting instruction is requested concerning evidence of other criminal acts, failure of trial court to give such instruction sua sponte is not reversible error).

Plaintiff contends much of the evidence at trial should not have been admitted because it was "suicide-by-police" evidence.  Plaintiff is wrong.  All of the evidence that was purportedly admitted to establish that Boyd committed suicide-by-police was relevant and admissible on other independent grounds.  Because Plaintiffs never requested *any* limiting instructions as to that evidence, the jury properly considered it, regardless of the suicide-by-police theory.

**A.   Evidence Of Boyd's Attempted Kidnappings Of Williams And Hogan Was Relevant And Properly Admitted.**

Evidence Boyd's attempt to kidnap Williams and Hogan at gunpoint was independently admissible because those acts are part of the "same transaction" or a "single criminal episode" that forms the basis of the lawsuit.  *See United States v.*

_____

[17] The only evidence admitted at trial that was relevant *solely* as it related to suicide-by-police was the evidence of anti-police rap lyrics found in Boyd's vehicle.

*Vizcarra-Martinez*, 66 F.3d 1006, 1012 (9th Cir.1995); *see also United States v. DeGeorge*, 380 F.3d 1203, 1220 (9th Cir. 2004). This "other acts" evidence is outside of Rule 404(b) where it is necessary to tell a coherent story regarding the circumstances surrounding the incident. *See Vizcarra-Martinez*, 66 F.3d at 1012; *United States v. Edouard*, 485 F.3d 1324 (11th Cir. 2007); *Bowden v. McKenna*, 600 F.2d 282, 284 (1st Cir. 1979)(plaintiff's verdict overturned because defendants officers were not allowed to present evidence that decedent had previously robbed a store to corroborate officers version of events that decedent tried to kill them and were just innocently sitting in the car as plaintiffs contended,).

Boyd's attempts to kidnap Williams and Hogan at gunpoint were part of a continuous chain of violent behavior that culminated in Boyd's death. Omitting that evidence would have given the jury an incomplete, distorted and incoherent account of the incident. It was therefore admissible for this reason alone.

Evidence of the kidnappings was also relevant to rebut Plaintiffs' claim for damages. In wrongful death suits, courts often admit evidence regarding the value of the decedent's care, comfort, and society: "In addition to these types of direct financial benefits, there is that less tangible and not so immediate, but nevertheless real, pecuniary benefit which often may reasonably be expected from a continuance of the society, comfort and protection of the deceased." *Corder v. Corder*, 41 Cal. 4th 644, 661 (2007). Where, as here, Plaintiffs presented extensive evidence about the decedent's involvement in their lives and the impact of his death on them, defendants could present evidence that the relationship between the decedent and the plaintiffs was poor, and that lower damages were therefore appropriate. *See id.*, at 662; *Benwell v. Dean*, 249 Cal. App.2d 345, 353 (1967).

Here, the attempted kidnappings established that Boyd would have been exposed to a decades-long prison sentence that would have substantially interfered with his relationship with Plaintiffs. As a result, that evidence was relevant to damages and was properly admitted on that basis alone.

Finally, evidence of the chase and kidnappings helped resolve disputed issues in the case. *United States v. Curtin*, *supra*, 489 F.3d at p. 950. At trial, Plaintiffs disputed: (1) whether Boyd appeared to be under the influence of drugs when on Larch; and (2) whether Boyd had a gun with him. (M.Boyd:1762:24-1763:10,SER32:25-33:9,SER4802:18-4804:7.) The testimony about the kidnappings corroborated that Boyd was acting crazy and appeared to be on drugs on the night of the incident. Further, testimony that Boyd possessed and used a firearm on the night of the incident—a fact strongly disputed by Plaintiffs— was corroborated by Williams and Hogan who testified that Boyd had pointed a gun at their heads. Accordingly, evidence relating to the kidnappings was properly admitted.

**B.      The Evidence Of The May 2, 2004 Oakland Incident Was Relevant And Properly Admitted.**

Plaintiffs also argue that evidence of the May 2, 2004 incident was inadmissible. But that evidence was also admissible to present a cohesive and comprehensible story to the jury. *See United States v. Vizcarra-Martinez*, 66 F.3d 1006, 1012 (9th Cir.1995). Boyd's behavior on May 2 – where he led the Oakland police on two high-speed chases, and repeatedly asked them to kill him– was the beginning of the chain of events that ended three days later in his death. The Oakland incident not only required Boyd to rent the SUV in which he drive on May 5, it was also the impetus for Marylon Boyd's plan to transport Boyd out of the state. Without evidence of the Oakland incident, the jury would have had no

context for Boyd's interaction with Marylon Boyd just prior to his crime spree in San Francisco and may have found her denial of the plan more credible.

The evidence related to the Oakland incident was also relevant to Plaintiffs' damages claim. Although Marylon Boyd testified that her relationship with her son was overwhelmingly positive, the Oakland incident showed the negative impact that Boyd had on his family. For example, as a result of the Oakland incident, Marylon Boyd had to post bail for Boyd and act as his criminal attorney. Further, because her vehicle was impounded after the Oakland incident, Marylon Boyd had to replace the car with a rental. The evidence also rebutted Plaintiffs' testimony that, were it not for the Larch incident, they would have had many years of companionship with Boyd.

Finally, the Oakland incident provided key corroborating evidence as to three hotly disputed issues in this case. The Oakland evidence established that Boyd was physically capable of getting down to the ground when ordered by police – a key issue in the case that was the subject of expert testimony. The evidence also suggested that an injury to Boyd's head was not sustained as a result of the Larch incident. Plaintiffs contended the injury to Boyd's head was caused by a bullet shot by Officer Paine on May 5. Evidence of the Oakland incident established that the head injury occurred on May 2, instead of May 5. And the evidence was corroborated the hotly disputed testimony that Boyd asked the police to shoot him during the incident on Larch – regardless of whether that was his actual desire. Accordingly, evidence of the Oakland incident was properly admitted on these independent grounds.

C. **The Evidence Of Boyd's Past Convictions And His Likely Sentence From His April 2003 Armed Robbery Was Relevant And Properly Admitted.**

Boyd's criminal history was relevant to damages because it rebutted Plaintiffs' claim for loss of comfort, care, and companionship. The violent felony charge pending against Boyd at the time of his death would have exposed him to decades in prison. As such, it bore directly on the quality of Boyd's future relationship with his family.

Boyd's criminal history was also admissible to rebut the testimony of Boyd's daughter, who testified about her close relationship with Boyd. Evidence that Boyd had been incarcerated for much of her life due to his prior convictions refuted her testimony and was therefore admissible. Similarly, evidence that Boyd would likely spend the next 15–26 years in prison was relevant to rebut their testimony.[18] Indeed, Plaintiffs have conceded that these facts were relevant to damages (Plaintiffs' Opening Brief p.40 fn.12), and because no limiting instruction was given, Plaintiffs cannot now object to the admission of this evidence.

D. **The Evidence Of How The 1993 CHP Accident Occurred Was Properly Admitted.**

The 1993 CHP incident and resulting accident were relevant to rebut Plaintiffs' damages claim that Boyd was uniformly a positive presence in their lives. Evidence of the 1993 accident established that Boyd also brought turbulence and pain to his family.

---

[18] Plaintiffs erroneously suggests that the details of Boyd's past convictions came into evidence. (Plaintiffs' Brief:48 n.12.) In fact, Defendants only presented evidence to the fact of the convictions themselves, not the details of the crimes. Although some details of the felony prosecution pending at the time of Boyd's death was presented, those details were presented through *Plaintiffs'* cross-examination of Defendants' expert. (Brass:SER3027:8-3044:2.)

This evidence was also relevant to rebut Plaintiffs' false assertions about the circumstances of the accident, as well as Plaintiffs' attempt to engender sympathy for Boyd based on the loss of his legs. Several witnesses testified about the "tragic" nature of the 1993 accident and its effect on Boyd's promising future. This testimony, which studiously avoided the cause of the accident, created the false impression that Boyd's injuries were not caused by his criminally reckless behavior.

Perhaps most importantly, evidence of the 1993 accident was properly admitted to rebut Marylon Boyd's testimony that on the day of the 1993 accident, Boyd had no difficulties with law enforcement. (M.Boyd:SER1804:10-1805:1.) This testimony was false, and thus "opened the door" to evidence that Boyd's accident was caused by his reckless flight from law enforcement. Evidence of the 1993 CHP incident was therefore properly admitted.

### E. The Evidence Of The Drugs In Boyd's System At The Time Of The Incident Was Properly Admitted.

Defendants presented evidence that Boyd was agitated and acting bizarrely. The toxicology evidence – which showed that Boyd was under the influence of various drugs, including amphetamine – support this. Because Plaintiffs disputed that Boyd was acting in a bizarre or agitated manner on Larch, the toxicological evidence was admissible. *See Saladino v. Winkler,* 609 F.2d 1211, 1214 (7th Cir. 1979) (evidence of plaintiff's intoxication admissible because such evidence "tends to make more probable that the plaintiff acted as the defendant contended he did or that plaintiff otherwise conducted himself in such a manner as to place the defendant reasonably in fear of his life"); *see also Lewis v. District of Columbia*, 793 F.2d 361, 363 (D.C. Cir. 1986). Plaintiffs concede this point when they argue, in an odd twist of logic, that the "suicide-by-police" evidence was not properly

admitted because Boyd's "drug use," which they also claim should not have been admitted, was a more reasonable explanation for his behavior. (Plaintiffs'Briefp.31.)  The toxicology evidence was also relevant to damages. Evidence of heavy drug use rebutted Plaintiffs' claims as to Boyd's life expectancy, his ability to provide for his family, and their assertions that the relationship with him was wholly positive.

## II.     ALL OF THE EVIDENCE TO WHICH PLAINTIFFS OBJECT WAS ALSO PROPERLY ADMITTED PURSUANT TO FRE 404(B).

Rule 404(b) is a "rule of inclusion."  *United States v. Rrapi*, 175 F.3d 742, 748 (9th Cir. 1999).  "Unless the evidence of other crimes tends only to prove propensity, it is admissible." *United States v. Jackson*, 84 F.3d 1154, 1158-59 (9th Cir. 1996).   Indeed, "Congress was not nearly so concerned with the potential prejudicial effect of Rule 404(b) evidence as it was with ensuring that restrictions would not be placed on the admission of such evidence."  *Huddleston v. United States*, 485 U.S. 681, 688-89 (1988).

Evidence of other bad acts is therefore admissible to prove "plan, knowledge, identity, or absence of mistake or accident."  Fed. R. Evid. 404(b).  This list is not exhaustive; it merely contains examples of appropriate uses of other acts evidence.  *United States v. Cruz–Garcia*, 344 F3d 951, 955 (9th Cir. 2003).  Simply put, evidence of other acts is admissible if it is relevant to any material issue other than character.  *Huddleston*, 485 US at 687; *see United States v. Edouard*, 485 F.3d 1324, 1344 (11th Cir. 2007) (defendant's prior drug smuggling activities admissible, even for dates years prior to alleged conspiracy, because relevant as to mental state and intent); *Roshan v. Fard*, 705 F.2d 102, 105 (4th Cir. 1983) (evidence of plaintiff's prior criminal conviction admissible to explain why bar fight occurred).

In the Ninth Circuit, evidence of prior bad acts may be admitted if the evidence is: (1) relevant; (2) not too remote in time; (3) sufficient to support a finding that defendant committed the other act; and in certain cases (4) the act is similar to the offense charged.[19] *Romero*, 282 F.3d at 688. All of the "suicide-by-police" evidence meets this test.

### A. The Evidence Of "Suicide-By-Police" Satisfied The Test For Admissibility Under 404(b).

#### 1. The Evidence Tended To Prove That Boyd Was Reaching Into The SUV – The Key Issue At Trial.

Despite Plaintiffs' argument to the contrary,[20] the key disputed issue in this case was whether Boyd was reaching into the SUV as if to get a gun or surrendering at the time he was shot. The evidence that Boyd had a "plan" to commit suicide-by-police was necessary to explain the otherwise inexplicable. Who, other than someone with a death wish, would reach back into a car when he is surrounded by police who know that he has a gun in the car and that he has recently fired that gun at them? Evidence that Boyd intended to commit suicide-by-police was therefore admissible to explain Boyd's plan and motive in reaching into the SUV.

Moreover, this evidence was admissible to rebut Plaintiffs' argument that Boyd was not reaching for his gun when he was shot. According to one of Plaintiffs' theories, Boyd was merely trying to surrender, but, because of his

---

[19] As this is a civil case, this fourth element is not relevant here.

[20] Although Plaintiffs repeatedly refer to the district court's observation during the pretrial conference that suicide-by-police was the "lynch pin" of Defendants' case. The district court's "lynch pin" comment was made before trial regarding motions in limine that were focused on discrete issues. At trial, the suicide-by-cop theory was a relatively small part of the case.

disability, he needed to use the inside of the car to lower himself to the ground. Evidence that Boyd intended to commit suicide-by-police was properly permitted to show that Boyd had no intention of surrendering.

Plaintiffs also contended that because the gun was not in the exact location Boyd was reaching, it was unlikely that he was reaching. (Closing:4794:18-4798:17.) Evidence that Boyd was attempting to get shot by the police, not attempting to escape, refuted this contention by making it less relevant whether his hand was near his gun when he was shot.

The "suicide-by-police" evidence was therefore admissible under 404(b) to rebut these claims to establish Boyd's motive and corroborate the Defendants' version of events. (*Bowden v. McKenna*, 600 F.2d 282, 284 (1st Cir. 1979)(plaintiffs' verdict overturned because defendants-officers should have been allowed to present evidence that decedents had previously robbed a store, when that evidence was offered to corroborate the officers' testimony that plaintiffs were not sitting innocently in the car, but were trying to kill them.)

Plaintiffs argue, however, that this evidence was irrelevant because under the objective reasonableness standard of *Graham v. Connor*, 490 U.S. 388 (1989), the officer's liability must be determined "exclusively" based on the information the officer had at the moment he fired. According to Plaintiffs, the district court, like the court in *Palmquist v. Selvick,* 111 F.3d 1332, 1339 (7th Cir. 1993), "should have limited the defense's evidence to the officers' personal knowledge – their experiences and observations – during the morning in question." (Plaintiffs' Briefp.38-39.)

Plaintiffs are wrong. Although the jury may only determine the propriety of the officer's actions based on the information the officer had, the jury, in assessing the credibility of the officer's version of events is not limited to the officer's

personal knowledge, experiences and observations.  If that were the case, excessive force cases would be considerably shorter because the only evidence that would be admitted regarding the incident would be the officer's testimony.

Plaintiffs' suggestion that *Graham* limits the evidence that may be considered in an excessive force case to the officers' observations is absurd.  In excessive force cases parties are routinely allowed to present evidence from sources other than the defendant officer to either support or rebut the officer's testimony as to his or her personal observations.  This evidence includes percipient witness testimony and physical evidence.  *Graham*, in fact, supports the admission of such evidence to assess the credibility of the officer's account.  *Graham*, 490 at 399 n.12;  *See also Billington v. Smith*, 292 F.3d 1177, 1181-1182 (9th Cir. 2002) (discussing numerous witness accounts of the incident, as well as fingerprint evidence developed after the incident.)

Here, the district court properly admitted physical evidence that corroborated the testimony that Boyd reached into the SUV of which Officer Paine had no personal knowledge.  Evidence that Boyd was intent on committing suicide-by-police is no different.  Although Officer Paine had no knowledge that Boyd was intent on committing suicide-by-police, the evidence that Boyd was in fact doing so corroborated Officer Paine's testimony that Boyd reached into the SUV.

In any event, Plaintiffs' reliance on *Palmquist* to suggest that a trial court abuses its discretion allowing suicide-by-police evidence in an excessive force case is misplaced.  In *Palmquist*, the plaintiffs alleged that an officers used excessive force when he shot and killed Palmquist.  At trial, "extensive" expert testimony was admitted regarding suicide-by-police.  *Id*. at 1341.  Defendants lost at trial and appealed, arguing, in part, that the trial court abused its discretion because they

were prohibited from presenting *additional* evidence that Palmquist committed suicide-by-police. The court held that the trial court did not abuse its discretion in refusing to admit *more* suicide-by-police evidence because "there was substantial evidence with respect to this theory" and further evidence along this line would be cumulative. *Id*. Thus, *Palmquist* does not establish that the admission of suicide-by-police evidence is an abuse of discretion. If anything, it stands for the opposite.

Furthermore, the Seventh Circuit noted it may have reached a different result if defendants had made the "potent argument" that the excluded suicide-by-police evidence was relevant to damages. *Id*. As the court explained, "[e]vidence that *Palmquist* wanted the police to kill him is directly relevant to his life expectancy." Here Defendants do make this argument. *Id.* Thus, the evidence is admissible.

### 2.    The Evidence Is Not Too Remote In Time.

As to the second prong of the 404(b) test, this Court has emphasized its "unwillingness to establish an inflexible rule for remoteness in the context of Rule 404(b )." *United States v. Hinton*, 31 F.3d 817, 823 (9th Cir. 1994). The vast majority of the acts, and all of the critical acts, that established Boyd had a plan to commit suicide-by-police occurred shortly before May 5, 2004. The Oakland incident was only three days before Boyd's death. His drug use occurred anywhere from 48 hours to one hour before the Larch incident. Boyd's attempted kidnappings of Williams and Hogan occurred just moments before his death on Larch. And, his impending criminal sentence for his 2003 armed robbery was hanging over his head up until the moment he was shot. The rap lyrics incident occurred only two weeks before Boyd's death. The only incident that was at all remote was the 1993 CHP accident. This incident, however, was not too remote because it was the cause of Boyd's downward spiral, from which he never recovered. In any event, Defendants only presented that evidence *after* Plaintiffs

opened the door by presenting false and misleading testimony as to how the accident occurred.

### 3. The Evidence Is Sufficient To Support A Finding That Defendant Committed The Other Act.

This third prong of the Rule 404(b) test also has a "low threshold"; there is sufficient proof of the prior acts at issue if they are admitted through testimony of a witness whose credibility was left to the jury. *See United States v. Romero*, 282 F.3d 683, 688 (9th Cir. 2002); *United States v. Houser*, 929 F.2d 1369, 1373 (9th Cir. 1990). Here, every fact to which Plaintiffs object that was admitted in support of Defendants' suicide-by-police theory was supported by the testimony of a witness, stipulation and/or certified court records. (*See supra* p.4-28.)

### B. Keram's Expert Testimony Was Admissible Because It Passes The *Daubert* Standard.[21]

Plaintiffs contend the district court abused its discretion by allowing Keram to testify about the suicide-by-police theory because her testimony did not satisfy *Daubert*. Plaintiffs attack the theory by asserting that: (1) Keram's findings cannot be tested; (2) the theory upon which her opinion is based has not been subject to peer review and publication; and (3) the technique that Keram used to arrive at her conclusions is not generally accepted in the scientific community. (Plaintiffs'Briefp.25-26.) Plaintiffs also suggest that Keram's actual testimony – as

---

[21] Plaintiffs do not appear to challenge Keram's qualifications. This is understandable. Keram is a psychiatrist licensed by the State of California and board-certified in psychiatry and forensic psychiatry. (Keram:SER4375:25-4405:24.) Keram has treated numerous patients, and teaches at the Veterans' Administration Hospital in Santa Rosa and the University of California at San Francisco. (Keram:SER4375:25-4405:24.) Keram also teaches at the FBI academy and various California law enforcement agencies about psychological issues that officers are likely to face. (Keram:SER4375:25-4405:24.) Keram has significant expertise relating to suicidal persons, including persons who have attempted suicide-by-police and she is highly familiar with the literature in the area. (Keram:SER4389:9-4405:24.)

opposed to the area of science and methodology on which she relied – had to be peer tested. (Plaintiffs'Briefp.26.) In other words, Plaintiffs appear to argue that an expert like Keram needs to have her opinions about the case peer-reviewed before testifying.

Plaintiffs distort *Daubert*, Keram's testimony, and her methodology. Keram's testimony easily satisfied the *Daubert* standard because it was based on a theory and method of analysis – one backed by peer-reviewed studies conducted outside of litigation – that is generally accepted in the psychiatric field. Plaintiffs provide no evidence to the contrary.

Under FRE 702, scientific expert testimony is admissible if: (1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case. In applying Rule 702, the district court must ensure that expert testimony is grounded in scientifically valid principles and relevant to the facts at issue in the case. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593-94 (1993). A proponent of scientific evidence may satisfy this standard by: (1) showing that the evidence grew out of pre-litigation research; (2) showing that the research upon which the evidence is based has been subjected to normal scientific scrutiny through peer review and publication; or (3) explaining how the conclusions were reached and pointing to some objective source to show that the conclusions are based on scientific method, as it is practiced by a recognized minority of scientists in the field. *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1141 (9th Cir. 1997).

/ / /

/ / /

Keram's testimony was admissible under any one of these three tests.

      **1.**    **Keram's Testimony About Suicide-By-Police, And The Psychological Autopsy Supporting It, Grew  Out Of Pre-Litigation Research, Was Based On Research Subjected To Peer Review, And Was Based On Objective Sources Recognized In The Psychiatric Profession.**

Plaintiffs attack Keram's testimony and methodology by grossly mischaracterizing it.  They assert that Keram lacked "any reliable method for identifying people who commit suicide-by-cop and their reasons for doing so because individuals who are suspected of seeking to commit suicide in this fashion generally are dead, and therefore cannot confirm or deny any hypothesis made about their intentions." (Plaintiffs'Briefp.26.)  They further assert that "Keram's hypothesis that Boyd wanted to be shot rests on nothing more than post-hoc rationalizations based on correlations among generic circumstances and behaviors" – in other words that "Keram's conclusions often constituted speculative inferences from mostly generic facts."  (Plaintiffs'Briefp.32-33.)  And they claim, without citation or explanation, that Keram relied on "unreliable correlation studies."  (Plaintiffs'Briefp.27.)

These assertions ignore the significant body of peer-reviewed scientific support for the evaluation of the mental state of deceased person (including those who have committed suicide-by-police) and also ignores the case law validating such evaluations (including evaluations of persons who have committed suicide-by-police).

First, as required by *Daubert*, both suicide-by-police and psychological autopsies have been studied in peer-reviewed journals for decades and outside of litigation.  Keram explained that suicide-by-police has been studied since the 1980s and is recognized by treating physicians.  There have been numerous peer-reviewed articles on suicide-by-police in medical journals and hundreds of articles

in law enforcement journals, some of which have been peer-reviewed. (Keram:SER4389:18-4400:15.)  In fact, law enforcement officers in California, as well as other states, are trained in suicide-by-police so that they can recognize it and, if possible, prevent it.  (Keram:SER4387:25-4388:24;SER4394:5-4395:7.)

Similarly, evaluation of the mental state of deceased persons – the "psychological autopsy" – is a well-recognized form of medical evaluation. Researchers began to study this area in the 1950s, and it is a generally accepted form of analysis in the psychiatric profession.  A huge amount of medical literature has grown around it, including thousands of peer-reviewed studies. (Keram:SER4423:3-4424:7.)

Second, both suicide-by-police and psychological autopsies are based on objective criteria recognized in the psychiatric profession.  Keram described in detail the method for determining whether a person has committed suicide-by-police.  According to Keram, in making this determination, one examines all available materials relating to the decedent's background and conduct/statements during the episode at issue, the physical evidence, and witness accounts. (Keram:SER4427:19-4430:13.)  Once these materials have been examined, the evaluator looks at the person's risk factors, the person's behavior, and evidence of suicidal intent.  Risk factors relevant to both suicide-by-police and suicide generally include financial problems, the prospect of significant jail time and hatred of the police.  (Keram:SER4427:13-4435:18.)

Relevant behavior may include:

• "Practicing" behavior.  People contemplating suicide-by-police frequently engage in a practice run, which reduces anxiety and allows them to learn from their mistakes.

• How the person came into contact with the police, and whether the person appeared to be seeking the attention of police.

• How the person behaved during the encounter with the police, including whether the person presented a lethal threat to the police (e.g., shooting or presenting a gun), whether the person asked the police to shoot him or her, and whether the person escalated the situation.

(Keram:SER4427:13-4435:18.)

Evidence of suicidal intent is derived from the decedent's actions and statements. Although persons committing suicide sometimes display a clear intent, they frequently do not. Only 2.2% of persons committing suicide-by-police leave a suicide note. Only 6.5% tell their family ahead of time. And, only 15% point a gun at the police to induce the police to shoot them. (Keram:SER4433:25-4435:18.)

Such an analysis of the mental state of deceased persons is routinely used in:

• Testamentary capacity cases, in which psychiatrists must determine whether a person who made out a will before dying had the mental capacity to do so.

• Life insurance disputes, where the issue is whether the decedent died accidentally or committed suicide.

• Death declarations

(Keram:SER4423:3-4426:18.)

In light of this, courts have repeatedly recognized the legitimacy of the suicide-by-police phenomenon. *See, e.g.*, *Hainze v. Richards*, 207 F.3d 795, 797 n.1 (5th Cir.2000); *Plakas v. Drinski*, 19 F.3d 1143 (7th Cir. 1994); *City of Simi Valley v. Superior Court*, 111 Cal.App.4th 1077, 1079, n.1 (2003); *Sullivan v. State*, 898 So.2d 105, 106 n.1 (Fla.App. 2005)).

Courts have allowed testimony about suicide-by-police in many contexts. In criminal cases, defendants have presented suicide-by-police as a defense to intent-based crimes. *See, e.g.*, *Alvarado v. Superior Court*, 146 Cal.App.4th 993 (2007) (criminal defendant successfully argued against weapon enhancement by introducing evidence that he was only armed to commit suicide-by-police, not to use weapon in robbery); *State v. Jackson*, 157 P.3d 660 (Kan.App.2007) (criminal defendant presented suicide-by-police defense to attempted first-degree murder of police officer); *Robbins v. State*, 145 S.W.3d 306 (Tex.App.2004)(criminal defendant offered suicide-by-police defense to show that he was more interested in harming himself than others).

In civil cases, both parties have presented suicide-by-police theories in excessive force claims under section 1983. *See, e.g.*, *Palmquist*, 111 F.3d at 1341 (court allowed expert testimony regarding suicide-by-police by plaintiff and defendant in section 1983 action); *Medeiros v. O'Connell*, 150 F.3d 164, 167, n.1 (2d Cir.1998) (affirming summary judgment in section 1983 case where expert testified that hostage-taker was bent on escalating the level of violence in order to commit "suicide-by-cop" and that negotiations were therefore futile); *Plakas v. Drinski*, 19 F.3d 1143, 1146-47 (7th Cir. 1994); *Campbell v. City of Leavenworth*, 13 P.3d 917, 922 (Kan.App.2000).

Similarly, courts have long recognized the legitimacy of psychological autopsies. These evaluations frequently include information given to the expert regarding the decedent's actions in the days and hours preceding his or her death. *See, e.g.*, *Giles v. Wyeth, Inc.*, 500 F.Supp.2d 1048 (S.D.Ill.,2007) (holding that psychological autopsy testimony satisfies *Daubert*); *In re Succession of Pardue,* 915 So.2d 415, 421 (La.App.2005) ("since the technique employed by [the expert] was substantially the same as the psychological autopsy method, which is

generally accepted in the psychiatric field, the trial court could reasonably have found that [the expert's] methodology was sufficiently reliable under the *Daubert* standard"); *Blanchard v. Eli Lilly & Co*., 207 F.Supp. 2d 308 (D.Vt.2002) ("The psychological autopsy is a generally accepted methodology for trying to determine what led to a suicide"); *Cloud v. Pfizer Inc.*, 198 F.Supp.2d 1118, 1135 (D. Ariz.2001) ("While Pfizer cites a law review article questioning the acceptance of psychological autopsies, these types of post-mortem autopsies appear to be generally accepted."); *Yanco v. U.S.,* 45 Fed.Cl. 782 (Fed.Cl.2000) (allowing use of psychological autopsy in determining whether psychological injuries leading to suicide were industrial or non-industrial); *U.S. v. St. Jean*, 45 M.J. 435 (1996).

Psychological autopsy evidence is often presented in cases involving disputes over the cause of death, including disputes over whether a death was a suicide. This evidence has been held to be relevant for determining:

• Whether a death was a suicide and thus excluded from a life insurance policy. *See Zanca v. Life Ins. Co. of North America*, 770 So. 2d 1 (La.App.2000).

• Whether a testator had sufficient mental capacity to devise a will. *See In re Estate of Hoover*, 155 Ill. 2d 402 (1993); *Succession of Werner v. Zarate*, 979 So. 2d 506 (La.App.2007).

• Whether a psychiatrist committed malpractice. *See Gaido v. Weiser,* 227 N.J. Super. 175 (1988).

• Whether a pharmaceutical caused decedent's suicide. *See Giles v. Wyeth, Inc.*, 500 F. Supp. 2d 1048 (S.D. Ill. 2007).

• Whether the cause of a suicide was industrial. *See Yanco v. U.S.*, 45 Fed. Cl. 782 (Fed. Cl. 2000); *T.W.M. Custom Framing v. Industrial Comm'n of Ariz.*, 198 Ariz. 41, 46-47 (2000); *Harvey v. Raleigh Police Dept.*, 85 N.C. App.540,

547-48 (1987); *Campbell v. Young Motor Co.,* 211 Mont. 680, 684 P.2d 1101 (1984).

    • Whether placement in jail administrative segregation caused inmate's suicide. *See Herrin v. Treon*, 459 F.Supp.2d 525 (N.D.Tex.2006).

    • Whether a minor decedent's suicide was caused by child abuse. *See Jackson v.* State, 553 So.2d 719, 720 (Fla.App.4 Dist.1989).

    • Whether the victim's death was a homicide or suicide. *See Horinek v. State*, 977 S.W.2d 696 (Tex.App. 1998).

    Accordingly, suicide-by-police, as well as post-mortem inquiry into a decedent's mental state are generally accepted scientific theories that are the proper subject of expert testimony under *Daubert*. Nonetheless, Plaintiffs appear to argue that because not everyone facing Boyd's problems commits suicide, it is improper to conclude that Boyd has tried to commit suicide. That is a non sequitur. Psychiatrists like Keram evaluate mental states of decedents on a regular basis, and they often reach individualized conclusions about the persons studied. That different people may react differently to similar factors in their lives does not mean that their mental states cannot be studied. That is exactly what Keram did here – study Boyd's mental state utilizing scientifically accepted methodologies – and Plaintiffs have no basis to dispute the admission of her well-grounded testimony.

    **2.    Each Piece Of Evidence Challenged By Plaintiffs Supported Keram's Opinion That Boyd Committed Suicide-by-Police.**

    To the extent that Plaintiffs contend that the evidence at trial did not support Keram's testimony that Boyd was trying to commit suicide-by-police, they are wrong. As Keram explained, the 1993 CHP accident and how it occurred supported her opinion Boyd never recovered from the loss of his legs and that he blamed the police for destroying his life. (Keram:SER4438:13-4440:22.)

Similarly, the evidence of Boyd's convictions and his time and experiences in prison after the CHP accident supported her opinion that Boyd had animosity towards the police and that, because of his difficulties in prison, the prospect of spending decades in prison was unacceptable to him.  As Keram explained, two-thirds of the individuals who committed suicide-by-police had a history of prior convictions.  (Keram: SER4438:13-4441:4.)

Keram also reasonably concluded that Boyd harbored significant animosity towards the police because, just two weeks before the incident, he was found with lyrics he wrote advocating murdering police officers together with an article and about a murdered police officer.   (Keram:SER4443:3-4444:16.)  In her testimony, Keram noted that one of the reasons individuals choose suicide-by-police as a way out is hatred of the police and, for the reasons stated above, there was ample evidence that Boyd met this criteria.  (Keram:SER4427:13-4440:15.)

The Oakland incident that occurred three days before the shooting demonstrated that Boyd was "practicing" suicide-by-police.  (Keram:SER4451:18-4454:5.)  Keram testified that "practicing" is a well-known activity for persons contemplating suicide-by-police because it reduces stress and familiarizes the person with how the police respond to particular behavior.  (Keram:SER4431:16-4433:13,SER4451:18-4454:12.)  The Oakland incident was evidence of "practicing" behavior in three respects: (1) the incident occurred just three days before the Larch incident (Keram:SER4451:18-4454:5); (2) Boyd appeared to seek police pursuit by reinitiating contact even after the police gave up (Keram:SER4451:18-4454:5.); and (3) Boyd made statements that reflected both a suicidal intent and a desire to be killed by police.[22]

_____

[22] This effort did not work, and Boyd learned to be more sophisticated and subtle in how he induced the police to shoot him. (Keram:SER4451:18-4454:5.)

Boyd's use of illegal drugs was also consistent with suicide-by-police.  Over two-thirds of persons committing suicide-by-police are under the influence of drugs or alcohol and the drugs Boyd took may have lowered his inhibitions and/or and caused post-intoxication depression, which can lead to suicide. (Keram:SER4448:9-4449:16.)

Boyd's statements about the police trying to kill him in the time period leading up to the incident were also consistent with suicide-by-police.  These statements became a self-fulfilling prophecy.  (Keram:SER4455:22-4457:14.)  As Keram explained, if Boyd actually believed that San Francisco police officers were trying to kill him, only a person intent on self-harm would refuse to leave the state and instead drive *to* the police and taunt police officers.  (Keram:SER4456:22-4458:24.)

Finally, Boyd's crime spree shortly before his death revealed a person whose goal was to draw police attention.  (Keram:SER:4457:23-4460:4.)  This behavior was consistent with someone who wanted to escalate the situation so that the police believed that he was dangerous, that he had a gun, and that he was willing to shoot police officers.  In so doing, Boyd made it more likely that the police would view him as a threat that needed to be met with deadly force when he reached into the SUV.  (Keram:SER4460:5-4463:20.)  Similarly, according to Keram, Boyd's actions were inconsistent with surrender.  Instead they appeared to be designed to induce the police to shoot.  (Keram:SER4464:15-4469:7,SER4453:21-4454:5.)

**C.      The Court Did Not Abuse Its Discretion In Allowing Keram To Testify Because She "Cherry-Picked"The Evidence.**

Plaintiffs state that Keram should not have been allowed to testify because some facts, if true, cut against her opinion – such as whether Boyd begged for his

life and whether he appeared suicidal to his step-father.  (Plaintiffs'Briefp.30.)
Plaintiffs misstate the law and the facts.

Expert witnesses may rely on hypothetical assumptions of fact in reaching
and expressing their opinions.  *Smolen v. Chater*, 80 F3d 1273, 1288 (9th Cir.
1996).  If those assumptions prove to be incorrect, the jury can assess the expert's
opinions accordingly.  *See* Rutter Group Prac. Guide Fed. Civ.Trials & Ev.Ch.11-
A,11:57.   Plaintiffs cite no authority that an expert's failure to accept their disputed
version of the facts disqualifies them from testifying – because none exists.

Moreover, Keram considered the evidence Plaintiffs claim she should have.
Plaintiffs asked Keram whether evidence that Boyd begged the police not to shoot
him would undermine her opinion.  Keram explained that these statements alone, if
true, would not be enough to do so because individuals committing suicide-by-
police are often engage in a cat-and-mouse game with the police.
(Keram:SER4509:11-4510:21.)[23]

Keram also considered other factors that Plaintiffs suggested weighed
against her opinions – such as the lack of a suicide note or extensive records of
psychological care.  But suicide-by-police research indicates that many people who
attempt suicide-by-police have had no psychological care, and that suicide notes
are rare.  (Keram:SER4433:25-4435:18.)[24]

---

[23] Plaintiffs incorrectly state that Keram failed to account for testimony that
Boyd did not seem suicidal in the weeks before the incident.  But Plaintiffs never
asked Keram any questions about such testimony, and could not have, as the
testimony was given in rebuttal *after* Keram testified.  (Dufauchard:SER4768:20-
4769:1.)

[24] Keram also testified that she had requested all of Boyd's psychological
records but her request was blocked by Plaintiffs, who sought and obtained a
protective order prohibiting the disclosure of Boyd's psychiatric records.
(Keram:SER4478:12-4779:19.) Although, Keram did see a note referring Boyd for
psychological care in the California Department of Corrections records she
reviewed.  (Keram:SER4478:21-4479:2.)

     **D.**    **Even If Error, Allowing Keram To Testify Was Harmless Because Defendants Could Have Argued That Boyd Committed Suicide-By-Police Based Solely On The Facts.**

Virtually all of the evidence upon which Keram relied upon for her opinion was otherwise admissible. From that evidence, Defendants could have argued, convincingly, and without any expert testimony, that Boyd's plan was to commit suicide-by-police and that his actions were consistent with that plan. Based on the admissible evidence, that argument would have been entirely proper. Keram's testimony, which was at the very end of a six-week trial, was helpful in making that point, but not essential. Therefore, any possible error in allowing Keram to express her opinion was harmless.

**III.**    **THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY DECLINING TO EXCLUDE THE DISPUTED EVIDENCE UNDER RULE 403.**

As described above, each piece of challenged evidence was admissible, was not unfairly prejudicial and the district court did not abuse its discretion in so ruling.

**IV.**    **THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY DECLINING TO EXCLUDE THE DISPUTED EVIDENCE UNDER RULE 703.**

Plaintiffs argue that admission of the disputed evidence violated FRE 703 because it was admitted solely on the basis of Keram's testimony. This argument has no basis. Most of the disputed evidence was admissible on grounds independent of the suicide-by-police theory. *See supra*,at 31-37. Moreover, defendants did not need Keram's testimony to argue that Boyd's conduct, both during and before the Larch incident, indicated that he planned to commit suicide-by-police. Thus, this evidence, whether admitted on damages, as corroborative of other testimony, or under Rule 404(b), was not "otherwise inadmissible" under Rule 703, and did not come into evidence simply because Keram relied on it.

## V.   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY DENYING PLAINTIFFS' MOTION TO BIFURCATE DAMAGES FROM LIABILITY.

Plaintiffs appear to argue that the district court abused its discretion by declining to bifurcate damages from liability.  They are wrong.

Fed. R. Civ. P. 42(b) allows, but does not require, a trial court to bifurcate cases "in furtherance of convenience or to avoid prejudice."  "Absent some experience demonstrating the worth of bifurcation, 'separation of issues for trial is not to be routinely ordered.'"  *Hamm v. American Home Products Corp*., 888 F. Supp. 1037 (E.D.Cal.1995) (*quoting* Advisory Committee Notes).  Where the evidence to be presented on two issues substantially overlaps, bifurcation is disfavored.  *See Hangarter*, 373 F.3d at 1021; *McLaughlin v. State Farm Mut. Auto. Ins. Co.,* 30 F.3d 861, 871 (7th Cir. 1994).  Rule 42(b) confers broad discretion upon a district court to determine whether bifurcation of a trial is appropriate.  *See, e.g.*, *Hangarter v. Provident Life and Acc. Ins. Co*., 373 F.3d 998, 1021 (9th Cir. 2004); *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002).  This discretion extends to the determination of whether to bifurcate damages and liability in section 1983 actions.  *See Davis v. Freels*, 583 F.2d 337, 343 (7th Cir. 1978).

Plaintiffs appear to contend that trying liability and damages together prejudiced Plaintiffs and risked confusing the jury.  However, these concerns could have been addressed in a far less burdensome way than bifurcation.  For example, Plaintiffs could have requested limiting instructions, but failed to do so.  *See Afshar v. City of Sacramento*, 2007 WL 779748, at *2 (E.D. Cal. March 14, 2007) (finding "appropriate limiting instructions" a "less burdensome way" to deal with potential prejudice or juror confusion than bifurcation); *Grissom v. Union Pac. R. Co*., 14 F.R.D. 263, 265 (D. Colo. 1953).

In any event, Plaintiffs have not carried their burden of showing that bifurcation was appropriate in light of the significant expense and inefficiency that it would have created. Accordingly, the district court did not abuse its discretion by declining to bifurcate the case.

**VI. BECAUSE OF THE OVERWHELMING PHYSICAL AND EYEWITNESS EVIDENCE THAT BOYD WAS REACHING INTO THE SUV AS IF TO GRAB HIS GUN WHEN HE WAS SHOT, ANY EVIDENTIARY ERRORS WERE HARMLESS.**

Contrary to Plaintiffs' assertion, the "central issue" in this case was not suicide-by-police. Both sides acknowledged during closing arguments that the critical issue in this case was whether Boyd appeared to Officer Paine to be reaching into his SUV for a gun when he was shot, or whether he had his hands up in surrender. (SER4783:13-15,SER4784:17-20,SER4791:10-17,SER4879:13-4945:1.) Both Plaintiffs' and Defendants' experts agreed that if Boyd was shot while reaching into the SUV, the shooting was reasonable and justified. (Clark:SER2024:21-2025:18;Cameron:SER4610:3-4617:24.) They also agreed that Officer Paine did not have to wait until he saw a gun in Boyd's hand before he shot — seeing Boyd reach into the vehicle was sufficient provocation for Officer Paine to shoot. (Clark:SER2024:21-2025:18;Cameron:SER4562:21-4569:6.) This is because if the officer waits until the suspect has a gun in his hand it is already too late. (Cameron:SER4562:21-4569:6.)

The lion's share of the evidence in this case therefore addressed whether Boyd was reaching into the SUV or surrendering with his hands in the air at the time he was shot.[25] And on that issue, the eyewitness testimony and physical

---

[25] In closing Defendants even told the jury that this case was not about suicide-by-police — it was about whether Boyd reached into the SUV. (Closings:SER4883:23-SER4884:16;4958:12-20.) As evidence of this fact, in closing arguments the word "reach" (or derivations of that word) was used over 190 times. Larch witness Campos was mentioned over 120 times, Harris over 60 times and blood spatter expert/ shooting reconstructionist Jason over 50 times. In

evidence overwhelmingly established that Boyd was reaching into the car. There was no physical evidence to the contrary, and the few witnesses who testified to the contrary lacked credibility.

Thus, on the key issue in this case — whether Boyd was reaching into the SUV when he was shot — this case was not close. As a result, any evidentiary errors made by the trial court was "more probably than not harmless" — and does not warrant reversal of the judgment below. *See Haddad v. Lockheed California Corp.*, 720 F.2d 1454, 1459 (9th Cir. 1983).

## CONCLUSION

Defendants respectfully request that the Court affirm the judgment of the district court.

Dated: January 26, 2009        Respectfully submitted,

DENNIS J. HERRERA
City Attorney
JOANNE HOEPER
Chief Trial Deputy
BLAKE P. LOEBS
SCOTT D. WIENER
ERIN BERNSTEIN
Deputy City Attorneys


By: s/Blake P. Loebs
BLAKE P. LOEBS
Deputy City Attorney
Attorneys for Defendants-Appellees

---

contrast, the term "suicide" (or derivation of that word) was used only 16. (Closings:SER4779:4-5112:3.)

## STATEMENT OF RELATED CASES

A related case, *Marylon Boyd, et al. v. City and County of San Francisco, et al.*, Case No. 08-16934, is currently pending in this Court.  This related matter is an appeal of the costs that the district court awarded Defendants-Appellees in connection with their prevailing at trial.

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief has been prepared using proportionately double-spaced 14 point Times New Roman typeface.  According to the "Word Count" feature in my Microsoft Word for Windows software, this brief contains 13,928 words up to and including the signature lines that follow the brief's conclusion.

I declare under penalty of perjury that this Certificate of Compliance is true and correct and that this declaration was executed on January 26, 2009.

DENNIS J. HERRERA
City Attorney
JOANNE HOEPER
Chief Trial Deputy
BLAKE P. LOEBS
SCOTT D. WIENER
ERIN BERNSTEIN
Deputy City Attorneys


By: s/*Blake P. Loebs*
BLAKE P. LOEBS
Deputy City Attorney
Attorneys for Defendants-Appellees

## PROOF OF SERVICE

I hereby certify that on January 26, 2009, I electronically filed the foregoing **DEFENDANTS-APPELLEES' ANSWERING BRIEF** with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*s/ Pamela Cheeseborough*
Pamela Cheeseborough

## PROOF OF SERVICE

I, Pamela Cheeseborough, declare as follows:

I am a citizen of the United States, over the age of eighteen years and not a party to the within entitled action. I am employed at the City Attorney's Office of San Francisco, Fox Plaza Building, 1390 Market Street, Sixth Floor, San Francisco, CA 94102. On January 26, 2009, I served the attached:

### DEFENDANTS-APPELLEES' SUPPLEMENTAL EXCERPTS OF RECORD

on the interested parties in said action, by placing a true copy thereof in sealed envelope(s) addressed as follows:

Jay B. Shapiro, Esq.
Forman & Associates
4340 Redwood Highway, Suite F228
San Rafael, CA 94903
Telephone: (415) 491-2310
Facsimile: (415) 491-2313
E-Mail: jay@gformanlaw.com

and served the named document in the manner indicated below:

☒ BY PERSONAL SERVICE: I sealed true and correct copies of the above documents in addressed envelope(s)/box(es) and caused such envelope(s)/box(es) to be delivered by hand at the above locations by a professional messenger service. A declaration from the messenger who made the delivery ☐ is attached or ☐ will be filed separately with the court.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed January 26, 2009, at San Francisco, California.

*s/Pamela Cheeseborough*
Pamela Cheeseborough